# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1196

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ROBERT MYKYTIUK,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-CR-078-S—**John C. Shabaz**, *Judge.*

_____

ARGUED AUGUST 3, 2004—DECIDED APRIL 1, 2005

_____

Before POSNER, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After executing a state search warrant for Robert Mykytiuk's residence and truck, Wisconsin law enforcement officers found a handgun and equipment, materials, and chemicals used to manufacture methamphetamine. Later, federal prosecutors took over the case, and Mykytiuk moved to quash the search warrant and suppress the evidence. The district court denied the motion. Mykytiuk then entered a conditional guilty plea to one count of possessing pseudoephedrine with intent to manufacture methamphetamine, see 21 U.S.C. § 841(c)(2), and

one count of possessing a firearm in furtherance of drug trafficking, see 21 U.S.C. § 924(c)(1)(A), reserving in his plea agreement the right to challenge the denial of his motion to suppress. The district court sentenced him to 90 months' imprisonment on Count One and 60 months' imprisonment on Count Two, to run consecutively. On appeal, Mykytiuk challenges the denial of his motion to suppress, arguing that the warrant was too broad and that the court erred in applying the good-faith doctrine. We conclude that the evidence was admissible under *United States v. Leon*, 468 U.S. 897 (1984), and we therefore affirm the judgment of conviction. Mykytiuk's challenge to his sentence, however, cannot be resolved until after a limited remand for further proceedings in the district court.

## I

On May 2, 2003, Jason Hagen, a detective for the Barron County Sheriff's Department, served a search warrant at Tim Soltau's residence and found chemicals and materials, including anhydrous ammonia, that led Hagen to believe that Soltau was manufacturing methamphetamine. After questioning, Soltau told two officers that he and Mykytiuk had stolen the anhydrous ammonia and stored it at Mykytiuk's residence until three days earlier, when Soltau stole it for himself. Soltau also told the officers that Mykytiuk manufactured methamphetamine and ordinarily kept the necessary materials in two five-gallon buckets in vehicles parked at his residence. Soltau informed the officers that Mykytiuk ordinarily carries a loaded firearm in his vehicle, and that while at Mykytiuk's residence, Soltau had fired fully automatic weapons belonging to Mykytiuk.

That day Hagen applied for a no-knock search warrant allowing officers to search Mykytiuk's residence, vehicles, and outbuildings on the property. Hagen's supporting affidavit detailed Soltau's statements. In the affidavit, Hagen

also represented that, "based on his experience and training," he believed that a "person manufacturing methamphetamine would ordinarily possess methamphetamine and drug paraphernalia within his/her residence." Based on the affidavit, Barron County Circuit Judge James C. Babler issued a no-knock warrant to search "vehicles parked on the property of 2117 6¼ street, Cumberland, Wisconsin and a yellow two story house and outbuildings at that location . . . [for] two five gallon buckets containing muriatic acid, paint thinner, pseudofed, lithium batteries, Coleman fuel, and/or coffee filters." Upon executing the warrant, the officers found components of a methamphetamine lab in a storage building as well as additional materials used to manufacture methamphetamine and a Colt .45 semi-automatic handgun (found in Mykytiuk's truck).

At that point, the investigation was referred to federal authorities. Mykytiuk was indicted for possessing pseudoephedrine, possessing a firearm in furtherance of drug trafficking, possessing chemicals and equipment to manufacture a controlled substance, and attempting to manufacture methamphetamine. He moved to quash the search warrant and suppress the evidence on the grounds that the warrant was not supported by probable cause, that the warrant's scope was too broad, and that no reasonable officer could have relied on the warrant in good faith. Magistrate Judge Stephen L. Crocker issued a report recommending that the motion be denied. Magistrate Judge Crocker reasoned that, although the warrant was not supported by probable cause, it was not overly broad and the officers had relied on it in good faith. Mykytiuk objected, but the district court adopted the report and recommendation and denied the motion to suppress.

## II

On appeal, Mykytiuk again urges that the search warrant was not supported by probable cause, that it was overly

broad, and that the good-faith exception to the exclusionary rule should not be applied to excuse the officers' conduct in this case. The government concedes that the search warrant was not supported by probable cause. We nevertheless address this question briefly, both because the government's concession is not ultimately binding on this court, and because the question whether probable cause was lacking is relevant to whether the officers relied on the warrant in good faith.

When, as here, an affidavit is the only evidence presented to a judge to support a search warrant, "the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755-56 (7th Cir. 2003). A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Where information from an informant is used to establish probable cause, courts should assess the informant's credibility by considering the following factors: (1) whether the informant personally observed the events, (2) the degree of detail shown in the informant's statements, (3) whether the police independently corroborated the information, (4) the interval of time between the events and application for a warrant, and (5) whether the informant appeared in person before the judicial officer who issued the warrant. *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir. 2000).

In *Koerth*, we had to decide whether statements from an informant of unknown reliability were sufficient to establish probable cause. 312 F.3d at 867-69. The evidence submitted in support of the search warrant in *Koerth* is similar to the evidence in the present case, as seen from the probable cause portion of the *Koerth* affidavit:

> On Wednesday, Aug. 30, 2000, a search warrant was executed at 806 Ruff Pl., Bloomer, Wis., which led to the seizure of marijuana, methamphetamine, and U.S. Currency. Investigation revealed that the marijuana and methamphetamine were purchased from a white male, known as Lonnie, who resides at 2344 195th Ave.
>
> Abraham Savage, who is believed to be a reliable source, indicated that he was at Lonnie's on Thursday, Aug. 29, 2000, and witnessed a large amount of marijuana. Savage stated he believed there was approximately 150-200 pounds of marijuana at the residence, as well as approximately two pounds of methamphetamine, a large bag of cocaine, and $30,000 in U.S. currency.
>
> Savage has purchased from Lonnie in the past and that [sic] is a member of the Iron Wings Motorcycle Club.

*Id.* at 867. The officer also requested a no-knock warrant because the informant had seen "numerous firearms" at Lonnie's residence. *Id.* We held in *Koerth* that despite the fact that the informant had first-hand knowledge of the allegedly illegal activity and gave "statements against his penal interest," the facts were presented in a "conclusory and essentially uncorroborated fashion." *Id.* at 870. The affidavit thus lacked a factual foundation, and was "based on the testimony of a previously unknown informant." *Id.* at 867. We also noted that the informant had not appeared in person before the state judge who issued the search warrant and that the police had not corroborated any of his statements. *Id.* at 868. In those circumstances, to uphold the state judge's probable cause determination "would be [impermissibly] to ratify the search of a home based on the use of essentially conclusory statements without corroboration." *Id.*

In the present case, Officer Hagan similarly failed to corroborate or provide foundation for Soltau's statements. Although Soltau provided first-hand information against his

penal interest, there was no evidence that he was a reliable witness or that he had provided accurate information in the past, and he provided only one detail to support the accuracy of his statements regarding Mykytiuk's methamphetamine production—that Mykytiuk stored his materials in two five-gallon buckets. This was a thin reed on which to rest the probable cause determination, and we are disinclined to second-guess both the district court's and the government's assessment of this point.

Even on the assumption that the warrant was bad and the search invalid, however, suppression of evidence is not the inevitable consequence. See *Leon, supra*. A facially valid search warrant issued by a neutral, detached magistrate will be upheld if the police relied on the warrant in good faith. See 468 U.S. at 913. An officer's decision to obtain a warrant is *prima facie* evidence that she was acting in good faith. See *United States v. Merritt*, 361 F.3d 1005, 1013 (7th Cir. 2004). A defendant can rebut the presumption of good faith only by showing that the issuing judge abandoned his role as a neutral and detached arbiter, that the officers were dishonest or reckless in preparing the supporting affidavit, or that the affidavit was so lacking in probable cause that no officer could have relied on it. See *Leon*, 468 U.S. at 923; *Peck*, 317 F.3d at 757.

Mykytiuk does not rely on either of the first two of those rebuttal theories. He argues only that this affidavit was so inadequate that a reasonable officer should have known that the warrant was no good. More specifically, Mykytiuk argues that the officers should have known that the warrant was invalid because this court's case law—specifically the *Koerth* decision—makes clear that statements like those from Soltau are insufficient to establish probable cause. In response, the government argues that it would be unreasonable to assume that every police officer knows about a federal appellate court's decision that appeared less than six months before the particular state search warrant was issued.

Police officers are charged with having knowledge of well-established legal principles. See *Koerth*, 312 F.3d at 869; *United States v. Adames*, 56 F.3d 737, 747 (7th Cir. 1995). This court took a narrow view in determining whether a legal principle is well-established in *Koerth*, holding that evidence seized pursuant to a search warrant should not be excluded unless the supporting affidavit is "plainly deficient" or where "courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand." 312 F.3d at 869. In the qualified immunity context, which uses a similar analysis, see *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986); *Koerth*, 312 F.3d at 869, it is only necessary for the plaintiff to "point to a closely analogous case decided prior to the challenged conduct in order to defeat qualified immunity," *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002).

We think that the cautious approach advocated by *Koerth* is correct. On this record, we do not have the type of evidence that has been found so wanting in the past—uncorroborated, conclusory assertions from unproven informants—that the availability of the good-faith exception has been forfeited. The officers had already found some of the ingredients necessary for manufacturing methamphetamine at Soltau's residence, during the May 2 search. That alone provided corroboration for Soltau's claim that he knew something about where the anhydrous ammonia found at his house had come from, and who else Soltau knew to be involved in the illegal activity. Furthermore, Soltau's statements to the officers went beyond the conclusory allegations we have criticized in the past. He specified where Mykytiuk kept the ingredients for his meth operation, and what kind of weapons Mykytiuk had in his possession.

We do not mean to excuse the local officers' apparent ignorance of *Koerth*. If a local drug task force routinely works with the federal government, it has a responsibility

to learn and follow applicable legal precedent. The officers could consult with federal prosecutors before obtaining a warrant. See *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (local agents contacted AUSA to seek guidance on how to proceed with a search); *Merritt*, 361 at 1012-13 (BATF agent relied on warrant in good faith where his affidavit was "drafted, reviewed, and approved by AUSA"). In fact, Magistrate Judge Crocker expressed his concern in his report and recommendation that a double standard could develop between state and federal appeals:

> A measurable percentage of these task force cases (including some currently before the court) contain deficient police work. If the government wishes to continue to bring these cases federally, it should start screening them more carefully and/or start providing more training to state and county agents so that a *de facto* double standard doesn't develop.

That said, we note that the scope of the good-faith exception to the warrant requirement may raise some federalism concerns. The state police officers were relying on the decision of the state judge to accept the affidavit, and it is a fact that the state trial courts are not bound directly by decisions of the federal courts of appeals. If, in a particular case, it could be shown that the conduct of the state courts and police complied with Fourth Amendment interpretations from the state supreme court and the U.S. Supreme Court, but was in apparent conflict with a decision of a federal court of appeals, we would need to decide what weight to give to the court of appeals' decision. That is not this case, however, and we therefore save for another day further consideration of this problem.

The Supreme Court has concluded that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclu-

sionary rule." *Leon*, 468 U.S. at 918. In the present case, we conclude that it is unlikely that suppression would improve the performance of either the local officers who were investigating the case or the federal prosecutors who relied on their work. Nonetheless, we join Magistrate Judge Crocker in urging the government to train local task forces and to screen the local cases that lead to federal prosecutions; appeals like this take time, and preventive measures will reduce their numbers.

Both parties also briefed the issue whether the scope of the search warrant was overly broad because it authorized the search of Mykytiuk's residence and outbuildings in addition to his vehicles. The only items found in Mykytiuk's residence were two old rifles and a package of illegal M-98 Magnum explosive fireworks. Neither of these guns served as the basis for the § 924(c)(1) charge. If, as we have assumed, the warrant was unsupported by probable cause, its scope is irrelevant. Because we have found that the officers reasonably relied on the search warrant, it was also reasonable for them to conclude that they could search Mykytiuk's residence. As Detective Hagan stated in his affidavit, it is reasonable to infer that a person who manufactures methamphetamine would keep drugs or materials in his house. A judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996) (quoting *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995)). "[I]n the case of drug dealers evidence is likely to be found where the dealers live." *Id.* (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). Thus, had the warrant itself been supported by probable cause, the scope of the warrant would have been proper.

### III

Shortly before oral argument in this case, we permitted Mykytiuk to file a supplemental brief in which he claimed that he was entitled to be resentenced under the principles announced in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), and this court's decision in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *aff'd*, 125 S.Ct. 738 (2005). In that brief, Mykytiuk acknowledged that he admitted to possession of a quantity of drugs that resulted in giving him a base offense level of 28 for purposes of the U.S. Sentencing Guidelines, § 2D1.1. The district court went on, however, to enhance the base level by three pursuant to U.S.S.G. § 2D1.1(b)(5)(B), based on its own finding that the offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life. It did so based on evidence that on May 15, 2003, Mykytiuk caused a fire in the building he used as his meth lab and he received burns that required hospital treatment. He objected to the enhancement on the ground that, although he did cause the fire, he did so not while he was manufacturing the drug but instead while he was lighting a heater to keep warm. Eventually, he withdrew this objection.

We conclude that Mykytiuk's objection was not enough to allow him to escape the plain error standard of review for his *Blakely/Booker* argument. In keeping with the procedure outlined in *United States v. Paladino*, Nos. 03-2296 *et al.*, 2005 WL 435430 (7th Cir. Feb. 25, 2005), we therefore order a limited remand to permit the sentencing judge to determine whether he would have imposed a different sentence had he known (in keeping with the sentencing majority in *Booker*) that the guidelines were merely advisory. Prior to coming to a conclusion, the judge should follow the following procedure outlined in *Paladino*:

> "[T]he District court should obtain the views of counsel, at least in writing, but need not require the presence of

> the Defendant, see Fed. R. Crim. P. 43(b)(3). Upon reaching its decision (with or without a hearing) whether to resentence, the District Court should either place on the record a decision not to resentence, with an appropriate explanation," or inform this court of its desire to resentence the defendant. (By "should" in the quoted passage we understand "must.")

*Paladino*, 2005 WL 435430, at *10, quoting *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). If the district court indicates that it wishes to resentence Mykytiuk, this court will vacate the sentence and remand for resentencing. At that point, with the defendant present, the district court must resentence in accordance with the Supreme Court's *Booker* decision and all relevant provisions of the Sentencing Reform Act, see 18 U.S.C. § 3553. During the limited remand to learn the inclination of the district court judge, this court will retain jurisdiction over the case.

## IV

We AFFIRM the district court's order denying Mykytiuk's motion to suppress. While retaining jurisdiction over the appeal, we REMAND for the limited purpose of learning the district judge's decision on the question of resentencing.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*