In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3137

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARNELL L. ELLIS,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 CR 107—**Rudolph T. Randa**, *Chief Judge.*

---

ARGUED MARCH 27, 2007—DECIDED AUGUST 27, 2007

---

Before MANION, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Darnell Ellis was convicted of possessing in excess of 500 grams of cocaine and was sentenced to 70 months' imprisonment. The drugs were discovered by DEA agents and local police officers during a search of Ellis's home. Ellis did not consent to the search and the agents and officers did not have a warrant when they entered the home. The district court concluded that there was probable cause and exigent circumstances sufficient to uphold the search. Following the district court's decision, Ellis entered into a plea agreement but retained the right to appeal the district court's decision on the legality of the search. We conclude that the search was improper and therefore reverse.

## I. HISTORY

On March 21, 2005, DEA agents in Milwaukee, Wisconsin were contacted by a cooperating informant ("CI"). The CI told them that he had been contacted by Daniel Garrity who wanted to sell the CI some crack cocaine. The DEA agreed to go forward using the CI in the transaction. The CI and Garrity arranged to meet that day at a parking lot outside a fast food restaurant in the 3300 block of 23rd Street in Milwaukee. The DEA agents established a surveillance of the parking lot and placed electronic devices on the CI to record the CI's conversations and track his movements.

The CI and Garrity each arrived in separate vehicles. The CI got into Garrity's vehicle and they negotiated the transaction. Approximately thirty minutes into the discussions, Garrity called his supplier on a cell phone and instructed the supplier to deliver the drugs to the parking lot. The supplier was unknown at that time but he later would be identified as Mitchell Wilson. Wilson arrived at the parking lot in a third vehicle and delivered the crack cocaine to Garrity. Garrity and the CI then completed the transaction and all three individuals went their separate ways in their own vehicles.

The DEA agents decided to follow Wilson. Wilson went to 3758 N. 40th Street, a duplex home. Wilson remained at the 40th Street home for a few minutes and then left. The agents then ended their surveillance and Wilson's identity remained unknown at that time.

A few days later, the agents decided to arrange a second controlled buy from Garrity through the CI. The agents apparently hoped that Garrity would use the same supplier. A second transaction was arranged for March 29th. However, Garrity was arrested before the second transaction could occur. The record does not explain why Garrity was arrested before he was able to complete the second

transaction. The agents questioned Garrity but he refused to disclose the identity of his supplier.

Hitting a dead end with Garrity, the DEA agents decided to perform a "knock and talk" investigation of the 40th Street home. A five person team was assembled consisting of Milwaukee police officers Chu, Lopez and McNeil and DEA agents Krueger and Ludington. The DEA learned that Rufus Jackson was the listed tenant for the home and that Jackson had two prior drug convictions. However, the team members were told other incorrect information. Team members were inaccurately informed that the 40th Street home was involved in drug transactions. Officer Lopez erroneously believed that a prior drug purchase had occurred at the 40th Street home.

Once arriving at the 40th Street home, the officers and agents surrounded the home. Officers McNeil and Chu went to the front door. Officer Lopez positioned himself at the side door and Agents Krueger and Ludington were at the back door. McNeil and Chu then knocked on the front door and announced themselves as police officers. Officers McNeil and Chu are patrol officers and were wearing their Milwaukee Police Department uniforms. Ellis did not open the door and instead spoke to McNeil and Chu through the door. McNeil and Chu asked Ellis to open the door so that they could come into the home. Officers McNeil and Chu claimed that they were investigating a missing child and asked Ellis's consent to search the home. Ellis said no and responded that he did not live there, no one who lived at the home was present at the time and that the police should come back later when the residents would be home. During the conversation between Ellis and Officers McNeil and Chu, Officer Lopez heard movement in the home and a person running up and down the stairs.

The movement turned out to be a second person in the home, Demarius Dean. Hearing Dean's movement, Officer

Lopez concluded that the occupants in the home were trying to destroy drugs. Lopez called out to the other officers and agents telling them that the residents were trying to destroy evidence. Officer Chu then came over to Officer Lopez's position at the side door and Officers Chu and Lopez broke down the side door entering the home. Lopez then saw Ellis at the front door. Agent Krueger entered into the home and went to the top of the stairs leading to the basement. He saw Dean holding an object. Krueger pointed his gun at Dean and told him to lay on his stomach. Krueger then determined that Dean was holding his cell phone. The agents and officers then conducted protective sweeps of the first floor and basement areas. They discovered cocaine residue in a bedroom on the first floor. They obtained a search warrant and then searched the home. The search discovered a firearm and two and half kilograms of cocaine.

Ellis filed a motion to suppress arguing that the government entered the home unlawfully and therefore conducted an illegal search and seizure. The magistrate judge recommended that the motion to suppress be denied and the district court adopted the recommendation *in toto*.

## II. ANALYSIS

"In reviewing the district court's denial of a motion to suppress, we review questions of law *de novo* and factual findings for clear error." *United States v. Groves*, 470 F.3d 311, 318 (7th Cir. 2006) (citing *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000)). "The determination of probable cause is normally a mixed question of law and fact, but when 'what happened' questions are not at issue, the ultimate resolution of whether probable cause existed is a question of law, which we review *de novo*." *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003) (citing *Ornelas v.*

*United States*, 517 U.S. 690, 696 (1996); *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999)).

Although Ellis denied living in the home when speaking to Officers McNeil and Chu through the closed front door, the government agrees that Ellis did live in the home. He had a legitimate expectation of privacy in his home and therefore he has standing to challenge the search of the home. *See generally United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (noting that a defendant must demonstrate a legitimate expectation of privacy in order to raise a Fourth Amendment challenge). We therefore turn to the merits of the Fourth Amendment issue.

"The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed', and accordingly, warrantless entries are considered presumptively unreasonable." *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001) (quoting *Payton v. New York*, 445 U.S. 573, 585-86 (1980); *United States v. United States District Court*, 407 U.S. 297, 313 (1972); *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)). "[Warrantless] searches [of a home] are constitutionally permissible . . . where there is probable cause and exigent circumstances create a compelling need for official action and insufficient time to secure a warrant." *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006) (quoting *United States v. Marshall*, 157 F.3d 477, 481-82 (7th Cir. 1998)).

"[D]etermining whether probable cause exists involves a 'practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993)). "Probable cause is a fluid concept based on common-sense interpretations of reasonable police

officers as to the totality of the circumstances" known at the time the event occurred. *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005) (citing *United States v. Brown*, 366 F.3d 456, 458 (7th Cir. 2004); *United States v. Sholola*, 124 F.3d 803, 814 (7th Cir. 1997)). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Ornelas*, 517 U.S. at 696.

The magistrate judge identified three items to support the determination that probable cause existed when the officers entered the home. First, the unknown supplier had gone to the 40th Street home immediately after completing the March 21st transaction and the government determined that the listed resident, Rufus Jackson, had two prior drug convictions. Second, Ellis had refused to open the door and denied that he lived at the home when he spoke with Officers Chu and McNeil. The magistrate's decision stated that "[w]hile citizens certainly have the right to refuse law enforcement officials' requests to enter their home, officers are not obligated to ignore reasons for a refusal that they deem unusual or suspicious." R. 43 at 7. Agent Krueger's testimony, as credited by the magistrate, was that Ellis's statement that he was not a resident of the home was suspicious. Agent Krueger explained that in his experience, a person will deny being an occupant of the home in anticipation of a search by the police so that the denying person can later claim that he was not responsible for drugs found during the search. Finally, the magistrate judge pointed to the movement in the home heard by Officer Lopez. The magistrate judge explained that movement can lead to the suspicion that the occupants were trying to destroy evidence before the police could enter.

However, the error in the district court was imputing the knowledge of the officers at the front door to Officer Lopez at the side door. Officer Lopez testified during the suppression hearing that he made the decision to enter the home upon hearing the footsteps within the home. Tr. at 69. Lopez also testified that although he could hear that Ellis and Officers Chu and McNeil were talking at the front door, Lopez "couldn't hear exactly what was being said back and forth." Tr. at 66. There is also no evidence that Officers Chu and McNeil communicated to Lopez before Lopez entered the home. Chu moved from the front door to the side door to assist Lopez in breaking down the door. However, Lopez was clear to point out in his testimony that he made the decision to enter the home based on the running in the house and Chu apparently came over to assist Lopez after Lopez had decided to break down the side door. Lopez did not hear Ellis's allegedly "suspicious" denial that he did not live in the home and his alleged statement that there was no one else in the home.

The inability to impute knowledge to Lopez in this situation must be contrasted to those situations in which we allow the imputing of knowledge between officers. "Under the collective knowledge doctrine, the knowledge of one police officer is imputed to other officers when they are in communication regarding a suspect. This doctrine permits arresting officers to rely on the knowledge, but not necessarily the conclusions (such as whether probable cause exists), of other officers. . . . [An] officer need not be personally aware of all of the specific facts supporting probable case, so long as an officer who is aware of such facts relay them to the other [officer]*." Reynolds v. Jamison*, 488 F.3d 756, 768 n.7 (7th Cir. 2007) (citing *United States v. Hensley*, 469 U.S. 221, 232-33 (1985); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000)). As there was no communication from Officers Chu

and McNeil at the front door to Lopez at the side door, it was improper to impute their knowledge to Lopez.

Consequently, a recitation of the pertinent facts for the evaluation of whether Lopez had probable cause to enter via the side door are: (1) an unknown drug supplier visited the home a week earlier for a few minutes, (2) the registered occupant had two prior drug convictions, (3) the person at the front door (Ellis) would not allow Officers Chu and McNeil to enter the home, and (4) Lopez heard movement in the home that made him concerned that drugs were being destroyed. On item three, we can infer that Lopez knew that Ellis was refusing entry to Chu and McNeil because the team's plan was to obtain consent to enter into the home. Consequently, a reasonable officer in Lopez's position would recognize that consent was not being offered when Chu and McNeil continued to talk to Ellis through the door.

A reasonable officer in Lopez's position can properly consider the fact that the then unknown supplier visited the 40th Street home immediately after supplying drugs to a drug transaction. Although "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," *United States v. Carpenter*, 342 F.3d 812, 815 (7th Cir. 2003) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)), it is appropriate to "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of the offense." *United States v. Mykytiuk*, 402 F.3d 773, 778 (7th Cir. 2005) (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996); *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995)). "In the case of drug dealers evidence is likely to be found where the dealers live." *Mykytiuk*, 402 F.3d at 778-79 (quoting *Reddrick*, 90 F.3d at 1281; *United States v. Lamon*, 930 F.3d 1183, 1188 (7th Cir. 1991)). Although

there was no evidence that the supplier lived at the 40th Street home, the fact that the supplier went to the home immediately after making a drug delivery is a fact to be considered in the probable cause determination.

We have also recognized that a person's reactions to the police can be considered in a probable cause determination. "While mere presence at the scene of a crime is not enough to establish probable cause, we know that it is generally accepted that 'flight can be strong evidence of guilt.'" *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (quoting *United States v. Lima*, 819 F.2d 687, 689 (7th Cir. 1987)). Drugs are an easily destroyable form of evidence and therefore an officer's suspicions may be raised when he or she hears movement. *United States v. Gillaum*, 372 F.3d 848, 855 (7th Cir. 2004). This suspicion could be increased if it appears that another occupant is preventing the police from entering in another location to buy time for his cohort.

However, the problem in this case is that the officers and agents lacked a warrant when they approached the home and utilized tactics that, if allowed to go unchecked, would eliminate the Fourth Amendment warrant requirement for a home with any connection to drugs. The 40th Street home had some connection to drug activity but it was rather low and by itself would not be sufficient to establish probable cause.

Knocking on a door will result in movement in any home because an occupant will move to the door to see who is knocking and possibly to answer the door. Others in the home will likely also move to see what is occurring. In this case, the home was effectively surrounded by officers and agents at the front, side and back. The record tells us that Officers Chu and McNeil at the front door were uniformed officers but the record does not tell us if the DEA agents at the back wore jackets identifying

themselves as DEA agents or if Lopez was identified on the side. It is reasonable that any person, not just people trying to destroy drugs, would be moving throughout the home to see what was going on the front, side and back of the home.

The key is that Lopez makes no efforts to differentiate the movement that occurred in the 40th Street home from the reasonable type of movement that would be found in any home where there was a knock on the door. There is no evidence that anyone in the 40th Street home said "It's the cops," the flushing of toilets, the throwing of items out of the windows, the immediate running out of another exit, the slamming of doors or other actions that could lead to a conclusion of criminal activity occurring within the home. In short, there is no evidence in the record to demonstrate that Lopez had any reason to single out the 40th Street home from any other home that has been connected to drug activity.

Thus, if we affirm the district court's decision in this case, we have effectively created a situation in which the police have no reason to obtain a warrant when they want to search a home with any type of connections to drugs. If the police knock on the door and seek to talk to the occupant without a warrant, there likely will be movement within any home. The police will then be able to respond that this movement increased their suspicion and also creates exigent circumstances that required that they enter into the home to prevent the destruction of the drugs that the police believed to be in the home. Alternatively, an occupant might open the door and consent to entry by the police. Thus, we have two choices presented to home occupants whose homes have some type of connection to drugs, either consent to the police when they ask to come into your home or if you do not consent, your movement within your own home to answer the door and the movement by others in the home, along with your home's prior

contact with drug activity, will create sufficient probable cause and exigent circumstances to allow the police to enter the home without the warrant.

We note that our conclusion relies on the fact that there is a minimum of information presented by the government about the 40th Street home on the probable cause issue. There was no effort by the government to develop additional evidence of criminal activity in the home before they decided to perform a knock and talk investigation. It was the government's decision to inform the occupants of the 40th Street home that they were targets of a government investigation when the government knocked on the front door and asked for consent to come into the home. The government took a gamble hoping that the occupants would consent to their entry or would open the door revealing contraband in plain sight. Perhaps if the government had come up with a better story than, "We're looking for a lost child, can we search the home?" they might have been able to convince Ellis to consent to their entry. However, once Ellis refused to consent, the occupants knew of the government's investigation of the home and so the government was concerned that the occupants might destroy any drugs that could be in the home. However, it was the government's choice to reveal itself to the home occupants by engaging in a "knock and talk" investigation and its decision backfired. It is perfectly lawful for the government to knock on the front door of home and ask to come in. However, once Ellis said no, the government could not save its case by kicking in the side door when it lacked either a warrant or probable cause coupled with exigent circumstances. We return the case to the district court to consider in the first instance whether there are any additional arguments to save the government's search of the 40th Street home and with it the government's case against Ellis.

## III.  CONCLUSION

The decision of the district court is REVERSED and the case is REMANDED for additional proceedings consistent with this decision.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*