In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3371

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES V. HOBBS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 10058, **Michael M. Mihm**, *Judge.*

ARGUED OCTOBER 31, 2007—DECIDED NOVEMBER 30, 2007

Before EASTERBROOK, *Chief Judge*, and BAUER and
WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge*. Defendant-Appellant Charles V.
Hobbs appeals from the district court's denials of his
motions to suppress evidence obtained from searches of
Hobbs's car and residence. Hobbs contends that the
officers lacked probable cause to stop Hobbs and search
his car or to obtain a search warrant for his house. We
agree with the district judge's conclusions that probable
cause existed in both instances challenged by Hobbs,
and therefore AFFIRM the denials of Hobbs's motions to
suppress.

## I.  Background

All of the matters that are the subject of this case began with a Peoria murder. In October 2004, Jason Hardges was shot and killed in the rear stairwell of a residence at 1006 Russell in Peoria, Illinois. Peoria police detective Chad Oberle investigated the death and discovered that Hardges and Hobbs had met to conduct a drug deal on the night of the murder. Oberle also learned that Hobbs had multiple violent crime convictions. Peoria police officers questioned Hobbs, who stated that he had met Hardges at CB Motors, an auto shop frequented by Hobbs, and that together they went to a nearby liquor store. According to Hobbs, both men then returned to CB Motors, where Hardges made a phone call and left shortly thereafter in a white-colored cab.

Police interviewed the liquor store owner who said that he was working the night of the murder, that he knew Hobbs and Hardges and knew that they were friends, but that neither came into the store that night. Oberle contacted all of the cab companies in the Peoria area that used white-colored cabs; none had any record of a pick-up at or near the vicinity of CB Motors on the night of the murder.

About a week after the murder, a gun found near the area of Forest Hill and Molleck Street in Peoria was linked to Hardges's death. Hobbs was questioned twice by police about Hardges's murder, but he denied any involvement.

### A.  Contina Gray's Statement to the Police

In April 2005, Hobbs's former girlfriend, Contina Gray, told Oberle that Hobbs had admitted his involvement in Hardges's murder to her. Specifically, Gray said Hobbs told her that he met Hardges at CB Motors to conduct

a drug deal; that they went to 1006 Russell Street, where Hobbs made Hardges open the door so that his own fingerprints did not appear at the scene. As Hardges walked up the rear staircase of the house in front of him, Hobbs told Gray he shot Hardges. Hobbs said that Hardges fell backwards down the stairs, and that he shot Hardges several more times on the landing. Hobbs told her that he disposed of the gun in the area of Forest Hill and Molleck Street.

Gray said she was living with Hobbs at the time of Hardges's murder, and that she recalled that, on the night of the murder, Hobbs borrowed her car and went out. When he returned, he seemed very nervous and wanted to watch the local news. He also asked for a plastic bag for the clothes he was wearing. Since Gray's television did not get the local news, Hobbs and Gray went to Gray's mother's house. On the way, they stopped the car and Hobbs threw the plastic bag containing his clothes into a ravine.

Gray said that she and Hobbs watched the news which reported that there had been a shooting on Russell Street and that the victim was still alive. Gray recalled Hobbs becoming so nervous that he could not sleep that night. The next day, Hobbs called Gray's mother twice to ask about any news updates on the shooting. During the second call, Gray's mother told Hobbs that the victim had reportedly died. Gray stated that after that call, Hobbs seemed more normal.

After the meeting with Gray, Oberle checked the ravine where Gray said Hobbs had discarded the clothes he wore the night of the murder. Oberle found a bag containing a sweatshirt matching the description that Gray had provided of what Hobbs was wearing the night of the murder.

Oberle noted that several other details reported by Gray had not been publicly released, including where the murder occurred (the rear stairwell of 1006 Russell Street), that Hardges had been shot multiple times, and that the murder weapon had been located at the precise location that Gray stated Hobbs told her he discarded it.

Oberle reported these details to the Peoria County State's Attorney's Office at various meetings between April and August 2005, and an assistant state's attorney advised him that there was probable cause to arrest Hobbs for Hardges's murder, but that the State's Attorney's Office hoped for a confession before charging Hobbs.

## B.  Hobbs's Arrest

Shortly thereafter, Oberle decided to arrest Hobbs for Hardges's murder. On the morning of August 10, 2005, Oberle went to the Peoria Heights Police Department, where Hobbs's parole officer told him that Hobbs was living at 1007 East Cox Street in Peoria Heights, Illinois, with his new girlfriend, Stephanie Turner. Oberle also reviewed a recent anonymous Crimestoppers report that stated that Hobbs was dealing drugs at the 1007 East Cox Street residence, and that Hobbs often used rental cars that he parked down the street from his residence. Oberle also reviewed a police report from July 14, 2005 filed by Hobbs and Turner that reported that their residence had been burglarized and that Contina Gray was the culprit.

While Oberle was at the Peoria Heights Police Department, other police officers conducted surveillance on Hobbs's residence. The officers discovered an Enterprise rental car parked one house down from Hobbs's residence and that the car was rented by Turner.

Around 11:45 a.m. on August 10, 2005, Oberle and another detective, Mark Lamb, took over the surveillance.

Shortly after their arrival, Oberle and Lamb saw Hobbs leave his residence, walk to the rental car, and drive away. Oberle had learned during the course of his investigation that Hobbs's driver's license had been suspended. Oberle and Lamb followed Hobbs to a nearby pharmacy; when Hobbs parked, the officers pulled their car behind the rental car, and placed Hobbs under arrest for the murder of Jason Hardges.[1] The officers noticed a white powdery substance on Hobbs's hands, right arm, and the right side of his clothing, which they believed to be cocaine. The officers put Hobbs in the back of their car and returned to Hobbs's car. They saw a small plastic bag and more white powdery substance on the driver's seat, as well as on the backseat and floorboard on the driver's side of the car. After the car was towed to the police station, it was determined that the white powdery substance was approximately 24 grams of cocaine.

### C.  The Search of Hobbs's Residence

After arresting Hobbs and recovering the cocaine from the rental car, Oberle and fellow Peoria police officer Brett VonDerHeide met at the Peoria Police Department to prepare a complaint for a search warrant for Hobbs's home. While they drafted the complaint, Peoria police sergeant Ronald Scott Cook, aware of Hobbs's arrest and possession of cocaine, went to Hobbs's house to conduct surveillance from an unmarked squad car. Cook saw Turner leave the house, look around, and then go back inside. A few minutes later, Cook saw Turner come out

---

[1] At the suppression hearing, Oberle stated that he arrested Hobbs both for the murder of Hardges and for driving with a suspended license. The police report written by Oberle on the evening of August 10, 2005 regarding Hobbs's arrest cites only the Hardges murder case as the basis for the arrest.

again and he followed her while she walked several blocks to where she briefly spoke with an unidentified man. While Cook followed her, another officer had taken over surveillance of the house.

As Turner was walking back to the residence, she looked directly at Cook and his unmarked squad car, and began walking faster. Cook believed that Turner had detected his surveillance. As a result, the officers detained Turner in front of the house. Concerned that someone else inside Turner and Hobbs's home might have seen Turner's detention and might destroy evidence, the officers entered the house using Turner's house key. The officers conducted a protective sweep to make sure no one else was present in the house.[2] They found no one in the house, but they saw a small amount of an off-white powdery substance on a bedroom dresser. The officers left the house immediately after determining that no one was present and did not touch or field test the powdery substance. The officers called VonDerHeide to inform him of the substance they had seen in the house.

Meanwhile, Oberle and VonDerHeide were drafting the complaint for a search warrant. The complaint described the dwelling at 1007 East Cox Street and sought authority to search and seize cocaine and any other related items. The complaint also stated that officers saw Hobbs exit the house and go directly to a car parked on the street, that the officers stopped Hobbs as part of

---

[2] Cook testified that he radioed his superior, Sergeant Adams, about Turner's detention, and they together decided that a protective sweep was necessary to preserve any evidence inside the house. However, Cook conceded at the suppression hearing that they had not perceived anything, up to the time they conducted the protective sweep, that made them suspect that anyone else was inside the house.

their criminal investigation, and that they observed an off-white powdery substance on Hobbs's pant leg. Further, the complaint stated that Oberle and Lamb looked inside the car and saw what appeared to be crack cocaine, that they then arrested Hobbs, and that the substance found both on Hobbs and in the car was determined to be 24 grams of cocaine. The complaint also noted that Hobbs was currently on parole with the Illinois Department of Corrections and was paroled to his residence at 1007 East Cox Street in Peoria Heights, Illinois, and that the officers had knowledge through their investigation that Hobbs was selling crack cocaine in the Peoria area. VonDerHeide, who authored the complaint, stated that, based on his training and experience, it is common practice for drug traffickers to keep drugs such as cocaine and other related items in their homes.[3] The final pertinent paragraph of the complaint contained a brief description of the surveillance and detention of Turner in front of the residence, and then read, "[t]o prevent the destruction of any evidence, officers performed a sweep of the residence. During the sweep of the residence, [an officer] observed what appeared to be an off-white powdery substance inside the residence."

At 2:10 p.m. on August 10, 2005, VonDerHeide presented his complaint for a search warrant to a Peoria County Circuit Judge, who then issued a warrant to search Hobbs's house at 1077 East Cox Street. Moments later, officers executed the warrant and seized nine ounces of crack cocaine, one ounce of powder cocaine, a digital scale, and a loaded .380 caliber pistol from the house. Later

---

[3] The last paragraph of the complaint lays out VonDerHeide's experience and training, which included thirteen years as a police officer, six years with the Peoria Police Department, assignment to the Special Investigations Division, Vice, and Narcotic Unit, and attendance at narcotics school.

that day at the police station, Hobbs admitted that the handgun and drugs belonged to him.

The Peoria police took the case to the United States Attorney's Office in Springfield, where they agreed to prosecute Hobbs on drug and gun charges. On August 22, 2005, Hobbs was charged by indictment with unlawful possession with intent to distribute more than five grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count 1); unlawful possession with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (Count 2); unlawful possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (Count 3); and unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g) (Count 4).

### D.  The District Court Proceedings

Hobbs moved to suppress the evidence obtained from the rental car and his house. On January 23, 2006, after a lengthy evidentiary hearing, the district court denied Hobbs's motion. At that hearing, the district judge ruled that the officers had probable cause to arrest Hobbs for Hardges's murder, in addition to having the alternative cause to arrest Hobbs based on Oberle's belief that Hobbs's license was suspended. Therefore, the evidence from the car was properly obtained.

The district judge noted that no one testified to any reason to believe that someone else was in the house who could destroy evidence, and therefore the protective sweep was improper, but that the only evidence referred to in the complaint for the search warrant that was produced by that sweep was one "cumulative" sentence about the off-white powdery substance seen inside the house. Even without that statement, the judge ruled that

the warrant was supported by probable cause, and therefore the evidence obtained from the execution of that search warrant was properly obtained. Finally, the district judge found that the state judge who issued the warrant and the officers who executed it were certainly doing so with the good faith belief that the warrant was supported by probable cause, and that therefore the *Leon* good faith exception would save the evidence, even if the warrant lacked probable cause.[4] The district judge concluded that the unreasonable protective sweep was not fatal to the probable cause determination, and Hobbs's motion to suppress was denied in its entirety.

On March 22, 2006, after the ruling on the motions to suppress, Hobbs entered a plea of guilty to Count 2 (possession with intent to distribute more than fifty grams of cocaine base) and Count 4 (possession of a firearm by a convicted felon), preserving his right to appeal the suppression ruling. On September 1, 2006, the district judge sentenced Hobbs to 360 months' imprisonment, followed by five years of supervised release.

## II. Discussion

On appeal, Hobbs contends that the district court erred in denying his motion to suppress the cocaine found in the rental car, and the drugs and gun found in the house, because both his arrest and the search warrant lacked

---

[4] The *Leon* good faith exception allows the government to save evidence illegally obtained (e.g., by an invalidated search warrant) if the government can prove that the police relied in good faith on the judge's determination that probable cause supported the complaint for the search warrant. *See United States v. Leon*, 468 U.S. 897, 921-924 (1984); *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002).

probable cause. Hobbs further argues that the *Leon* good faith exception does not apply because a reasonable officer should have known that the search warrant lacked probable cause.

Determinations of probable cause are reviewed *de novo*, while findings of fact are reviewed for clear error, with deference given to inferences drawn from those facts by judges and law enforcement officers. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Hunter*, 86 F.3d 679, 681 (7th Cir. 1996). Probable cause is a commonsense, nontechnical conception that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas*, 517 U.S. at 695 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

### A. Probable Cause to Arrest Hobbs

Hobbs argues that the officers lacked probable cause to stop and arrest him in the pharmacy parking lot. First, Hobbs contends that the statement given by his ex-girl-friend, Contina Gray, about the murder of Jason Hardges, does not establish probable cause to arrest him for that murder. Hobbs claims that Gray is a bitter ex-lover who lacks reliability or trustworthiness.

Probable cause to arrest exists when officers "possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that [the] suspect has committed, or is committing, a crime." *United States v. Brown*, 366 F.3d 456, 458 (7th Cir. 2004). Again, probable cause is a commonsense principle grounded in the totality of the circumstances at the time of arrest and the reasonable interpretations of the arresting officers. *Id.*

On August 10, 2005, the Peoria police officers had probable cause to arrest Hobbs for Hardges's murder. The officers knew that Hobbs had a history of violent crime. They also knew, from Hobbs's own statement to the police, that Hobbs had the opportunity to kill Hardges that night, since they were together the night of the murder to conduct a drug deal—an activity that, in the officers' experience, frequently leads to physical violence, including murder. While Hobbs denied any involvement in the murder, the officers reasonably believed that Hobbs had lied to them about what he and Hardges did and where they went the night of the murder. While Hobbs claimed that he and Hardges went to a liquor store and then Hardges left in a white-colored cab, the liquor store owner, familiar with both men, said that neither of them were in the store that night. Nor did any cab company operating white-colored cabs in the Peoria area have any record of a pick-up in the area Hobbs's described. The officers reasonably believed that Hobbs lied since his alibi had failed him.

As to Gray's credibility, Hobbs ignores the fact that the officers corroborated her statements. Gray's statement contained non-public details about the murder, including the precise location of the murder within the dwelling on Russell Street, the number of times Hardges had been shot, and the location of the murder weapon. Only the murderer and a few Peoria police officers knew these details. The officers also verified Gray's statement about Hobbs throwing a bag of clothing into a ravine by going to the ravine and finding a bag containing a sweatshirt described by Gray.

Finally, the officers reasonably believed Gray's statements about Hobbs's nervous behavior on the night of the murder and the following day. Nothing in Gray's explanation of his nervousness or interest in the local news reports on the murder contradicted any of her

other statements or otherwise appeared disingenuous. Even if Gray's statement was provided out of her spite for Hobbs, her testimony was nevertheless a source of valuable and credible information, corroborated by the Peoria police. *See*, *e.g.*, *United States v. Connors*, 441 F.3d 527, 530 (7th Cir. 2006) (finding that a former lover's betrayal or cooperation with the government does not warrant evidence unreliable or inadmissible).

Based on the totality of these circumstances—a record of violent crime, an opportunity to commit the crime, a false exculpatory statement, a confession to a former girlfriend, nervous and bizarre behavior surrounding the news of Hardges possibly surviving the shooting, and the corroboration of the former girlfriend's report to the police—the district court properly concluded that the officers had probable cause to arrest Hobbs for murder.

Hobbs also contends that the officers lacked probable cause to arrest him for driving on a suspended license. Hobbs claims that simply because Oberle discovered at some unidentified point during the Hardges murder investigation that his license was suspended, Oberle did not have probable cause to suspect that Hobbs's license was still suspended at the time of the arrest.

The only evidence regarding Hobbs's driving privileges was Oberle's testimony that sometime prior to Hobbs's arrest, he had discovered that Hobbs's driver's license was suspended. Oberle also testified at the suppression hearing that at the time of the arrest, he was still of the belief that Hobbs's license was suspended. The district court judge found Oberle's testimony to be credible, and without clear error, we refuse to disturb that credibility determination. *See United States v. Thompson*, 496 F.3d 807, 809 (7th Cir. 2007) ("Because the resolution of a motion to suppress is a fact-specific inquiry, we give deference to credibility determinations of the district

court judge, who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing.") In light of Oberle's belief that Hobbs's license was still suspended and the complete lack of evidence to the contrary, the officers also had probable cause to arrest Hobbs for driving with a suspended license. The district court properly denied Hobbs's motion to suppress the evidence obtained from Hobbs's car.

## B. Probable Cause for the Search of Hobbs's Residence

Hobbs's next argument is that the officers lacked probable cause to search his residence. Hobbs argues that the officers' protective sweep of the house, during which they noticed an off-white powdery substance on a bedroom dresser, was improper. Assuming the sweep to be improper, as it was determined by the district court, Hobbs contends that absent the statement in the complaint for the search warrant about the powdery substance in the house, the complaint did not establish probable cause because there was no nexus between the items sought by the warrant and the residence. As a result, Hobbs believes that the evidence obtained from the execution of that warrant ought to be suppressed. Hobbs also asserts that the *Leon* good faith exception does not apply to the evidence obtained from the house because no reasonable police officer would have thought that the search warrant was supported by probable cause.

Whether a warrant affidavit includes sufficient indicia of probable cause is a legal conclusion that we review *de novo. United States v. Wiley*, 475 F.3d 908, 914 (7th Cir. 2007). A court's determination of probable cause is entitled to considerable deference and should be overruled only when the supporting affidavit, read in the totality of the circumstances, fails to allege specific

facts and circumstances that reasonably lead to the belief that the items sought in the search warrant are likely to be located in the place to be searched. *Gates*, 462 U.S. at 238; *Wiley,* 475 F.3d at 914-15. It is appropriate to "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007) (citing *United States v. Mykytiuk*, 402 F.3d 773, 778 (7th Cir. 2005)). "In the case of drug dealers evidence is likely to be found where the dealers live." *Id.* at 691 (citing *Mykytiuk*, 402 F.3d at 778-79).

The fact that a complaint for a search warrant contains information obtained through an illegal entry does not render the search warrant invalid. *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). Rather, if the judge could have found probable cause for the warrant without the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to seek the search warrant as a result of what they observed during the initial unlawful entry. *Id.*

The facts make clear that Oberle and VonDerHeide had already begun drafting the complaint for the search warrant before the initial sweep of the house took place. Thus, it is clear that the officers were not prompted to obtain the warrant as a result of information about the powdery substance inside the house. The officers reasonably believed that Hobbs, an alleged drug dealer, would keep his drug supply at his house. This Court has repeatedly recognized that such a belief is reasonable. *See, e.g., Ellis*, 499 F.3d at 691; *Mykytiuk*, 402 F.3d at 778-79; *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991). Less than three hours earlier, Hobbs had been seen leaving his residence, and within moments, was

found to possess 24 grams of cocaine. It was this discovery of cocaine, not the powdery substance seen in the house, that led the officers to obtain the search warrant.

The untainted evidence provided in the complaint for the search warrant sufficed to establish probable cause. While Hobbs states that VonDerHeide's assertions that drug dealers tend to keep drugs and related items in their homes are "boilerplate" and insufficient to establish a particular basis for believing more drugs were in the house, he ignores the reasonable inference from the facts and circumstances of this case, that, in addition to the nature of the drug offense charged, more drugs and related items would likely be found in his house. *See*, *e.g.*, *Ellis*, 499 F.3d at 691; *Mykytiuk*, 402 F.3d at 778-79; *Reddrick*, 90 F.3d at 1281; *Lamon*, 930 F.2d at 1188. The complaint for the search warrant included statements that Hobbs was known to be a drug dealer in the community, that he was caught carrying a substantial amount of cocaine immediately after leaving his house, and that drug dealers tend to keep drugs in their houses. This alone was sufficient to establish probable cause.

Since we find the untainted portions of the complaint for the search warrant sufficient to establish probable cause, we need not address the propriety of the protective sweep or the officers' good faith belief that the warrant was valid.

### III. Conclusion

We agree with the district court's conclusion that the officers had probable cause to arrest Hobbs both for the murder of Jason Hardges and for driving with a suspended license. We also agree that the complaint for the search warrant was not dependent on the evidence obtained during the protective sweep. We believe the legally ob-

tained evidence against Hobbs was more than enough to establish probable cause for the search warrant, and we therefore AFFIRM the district court's denials of Hobbs's motions to suppress.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*