UNITED STATES of America,
Plaintiff–Appellee,

v.

Marden Terry REGISTER,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Marden Terry REGISTER,
Defendant–Appellee.

Nos. 90–8005, 90–8007.

United States Court of Appeals,
Fifth Circuit.

May 6, 1991.

Stephen M. Orr, Austin, Tex., for defendant-appellant.

LeRoy Morgan Jahn, W. Ray Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., Mark H. Marshall, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellee.

Before BROWN, KING and GARWOOD, Circuit Judges.

KING, Circuit Judge:

Defendant-appellant Marden Terry Register (Register) was indicted on February 21, 1989, for conspiring to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; for possessing cocaine on January 20 and 22, 1989, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) [1]; and for using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(4).

Register was convicted by a jury on the cocaine charges but not on the firearm charge. He was sentenced to concurrent terms of thirty-six months imprisonment and three years of supervised release on each count of conviction, fined $15,000, and assessed $150. On appeal, Register contends that the district court erred in denying his motion to suppress evidence because the search was conducted illegally. He also asserts that the convictions for possession with intent to distribute were multiplicitous and in violation of the double jeopardy clause of the fifth amendment.

The United States appeals from the district court's sentencing determinations, arguing that the district court erred by (1) refusing to consider, in determining Register's base offense level, evidence of his previous involvement with narcotics that was part of the same course of conduct as the offense of conviction, and (2) failing to

---

**1.** Two separate counts of the indictment were for possession with intent to distribute, one stemming from the January 20 transaction, the other stemming from the January 22 transaction.

assess two offense levels against Register for possession of a weapon during the commission of the offense of conviction.

## I. *Background*

On January 22, 1989, Drug Enforcement Administration (DEA) Agent Douglas Cortinobis (Cortinobis) and several other DEA agents and Austin Police Department officers executed a "controlled buy" of narcotics from Register. The officers were working with an informant, Angela Korycki (Korycki), whom they had arrested on charges of possession of cocaine with intent to distribute a couple of days earlier. Korycki had agreed to cooperate in the officers' plan to obtain the arrest of her source for the cocaine, whom she had identified as Register. In a recorded telephone conversation, Korycki arranged to meet Register at his condominium, pay him $1,600 for cocaine that she had already obtained on credit, and pick up an additional ounce of cocaine. The undercover team arranged to monitor the "buy" from the ground.

When the appointed meeting time arrived, the agents, needing additional time to organize the surveillance, instructed Korycki to call Register and advise him that she was running late. During that conversation, Register informed Korycki that he would soon be leaving the condominium to attend a Super Bowl party. Shortly thereafter, Cortinobis accompanied Korycki, who was searched beforehand for possession of narcotics, to the eleventh floor of the condominium complex where Register lived. Cortinobis then returned to the first floor in order to avoid raising suspicions. Korycki was wired with a transmitter and other officers monitored the ensuing conversation.

Korycki entered Register's condominium, gave Register the money that she owed for

her earlier purchase, and picked up the additional ounce which was contained in a sealed envelope. Some ten minutes after entering Register's condominium, Korycki returned to the ground floor. Cortinobis inspected the contents of the sealed envelope and found that it field-tested positive for cocaine.

After the "buy" was completed, Cortinobis met with the other surveillance units. The group decided to "secure" Register's condominium in order to prevent his flight and the possibility of destruction or loss of any evidence.[2] The surveillance team was entering the elevator to ascend to the eleventh floor when a security guard approached and was apprised of the operation. He ascended with the team and informed Cortinobis, en route, that he had a pass key which would access Register's condominium, but that it was located in the security office on the first floor. Cortinobis decided that to wait for the guard to obtain the key would endanger the operation.

When the group reached Register's condominium they announced "Police—open the door" and pounded on the door. Receiving no response from Register, the officers knocked the door open with a sledgehammer. They found Register standing in the kitchen in a bathrobe, arrested and handcuffed him, and advised him of his rights. They also conducted a brief, cursory search for other individuals in the apartment. During this initial search, a loaded gun was discovered in a holster on the headboard of the bed in the master bedroom.[3]

The officers then informed Register (who refused to consent to a search and requested an attorney) that a search warrant was being prepared. Two hours elapsed before

---

**2.** The officers believed that the layout of the complex would make it possible for Register to leave his condominium undetected. None of the officers knew what Register looked like, and the agents believed that multiple elevator facilities and two separate gates out of the complex would enable him to move easily within the complex or to exit the complex. Cortinobis believed, consequently, that the only way to ensure that Register did not escape was to stand

directly by the door, but to do so would have potentially raised suspicions and endangered the operation. Upon learning of their presence, for example, Register could have destroyed the evidence.

**3.** Prior to trial, Register moved to suppress the fruits of the allegedly unlawful search and seizure. That motion was denied.

another agent notified the officers waiting at the condominium that a search warrant had been obtained. While waiting for the warrant to arrive, Register and the officers remained in the living room of the condominium.

DEA Agent Childress, who had not participated in the security sweep, then arrived with the search warrant. While the search was being conducted, Childress asked Register if he would be willing to cooperate in the investigation and told Register that such cooperation would be made known to the prosecuting attorney. Register indicated that he would like to cooperate but that he did not trust the agents to make his cooperation known, and that he would like his attorney present if and when he did cooperate. At that point, Childress directed another officer to summon a narcotics detection dog to the scene. As the officer was leaving the room, Register offered to cooperate, asking: "Can I show you where the cocaine is?" Subsequently, the officers found several ounces of cocaine, large amounts of money—including the $1,600 used in the Korycki transaction—and various other inculpatory evidence, including an electronic scale and a cocaine grinder containing cocaine residue.

## II. *Discussion*

### A. Fourth Amendment Claim

■ Register contends that the evidence obtained in the search of his condominium was tainted and should be suppressed because the condominium was initially entered without a warrant and no exigent circumstances which would justify a warrantless entry existed.[4]

We find it unnecessary, however, to reach the question whether under the facts of this case, exigent circumstances justified a warrantless entry into Register's condominium. For under the Supreme Court's

holding in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), evidence obtained pursuant to an independently obtained search warrant is admissible despite the fact that the evidence has been observed in plain view after an unlawful entry. *Id.* at 541, 108 S.Ct. at 2535. The Supreme Court stated that the ultimate question "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue...." *Id.* at 542, 108 S.Ct. at 2535. A warrant secured on evidence observed during the illegal entry could not, according to the Court, fall within the "independent source" exception. *Id.*

We find the rule set forth in *Murray* to be controlling in this case. DEA agent Childress began preparing an affidavit for the search warrant prior to Korycki's meeting with Register. The affidavit could not be completed until the meeting was concluded, but an examination of the affidavit reveals no mention of information elicited by the security sweep, other than the general statement that the premises had been secured to prevent the loss or destruction of evidence. Consequently, the issuance of the warrant was not based upon any illegally obtained evidence, and the search conducted pursuant to the warrant was a genuinely independent source of the information and evidence at issue. We find, therefore, that for fourth amendment purposes the evidence elicited by the search was admissible and the district court did not err in denying the motion to suppress that evidence.

### B. "Knock and Announce" Rule

■ Register also contends that the officers' entry violated the "knock and announce" provisions of 18 U.S.C. § 3109.[5] During the pretrial suppression hearing,

---

4. *See Arkansas v. Sanders,* 442 U.S. 753, 759, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979) (excepting from fourth amendment's warrant requirement "those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral Magistrate").

5. "The officer may break open any outer or inner door or window of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance...." 18 U.S.C. § 3109.

the judge heard testimony relating to the conduct of the officers just prior to their forced entry into Register's condominium. Our standard of review dictates that we should uphold the district court's ruling to deny the suppression motion "if there is any reasonable view of the evidence to support it." [6]

The district judge heard the testimony of DEA Agent Cortinobis that he yelled "Police" and pounded on the door with his knuckles and that after a few seconds with no response, he yelled "Police. Open the door," prior to authorizing use of the sledgehammer to break open the door. The judge also heard the testimony of the security guard who stated that the officers first knocked on the door, and then, after receiving no response, rang the doorbell, after which they broke in. The security guard stated that he could not recall hearing the officers yell "Police," and that it "[d]idn't seem like very long" after they rang the doorbell when they began hitting the door with the sledgehammer. This evidence can be reasonably viewed in its totality as supporting the conclusion that no "knock and announce" violation occurred.

In a prior case alleging an 18 U.S.C. § 3109 violation, in which positive testimony showed that the agent knocked, and nobody testified that the agent *failed* to give the required announcement, although the arresting officer did not affirmatively recall whether the agent actually announced anything, we found on the basis of the evidence that the statute had not been violated. *United States v. Gardner,* 553 F.2d 946 (5th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978). In *United States v. Mueller,* 902 F.2d 336, 343–44 (5th Cir.1990), we followed *Gardner* and held that even in the *absence* of positive testimony that the officers knocked, the evidence offered by the defendant—that he was in a bedroom asleep, did not hear the officers announce their presence, and would have heard them had they

done so—"too speculative" to support an 18 U.S.C. § 3109 claim.

In the instant case, the testimony was undisputed that Cortinobis knocked; there was positive testimony that he announced "Police," and the security guard, although he could not recall hearing the announcement, did not affirmatively state that the announcement was not made. In the light of our prior holdings, we find that the evidence introduced by Register does not compel acceptance of his § 3109 claim; we therefore uphold as reasonable the district court's denial of Register's motion to suppress the evidence on § 3109 grounds.

## C. Double Jeopardy

Register also asserts on appeal that Counts Two and Three of the indictment are multiplicitous. Although the charges of possession of cocaine with intent to distribute reference two separate dates, he contends that possession is a continuous offense and that he should prevail on the double jeopardy argument unless the government proves that the cocaine came from separate "stashes."

 This court maintains, however, that the *defendant* bears the burden to establish, both in law and in fact, the *commonality* of the offenses. *See United States v. Marable,* 578 F.2d 151, 153 (5th Cir.1978) ("To support a claim of double jeopardy, a defendant must show that the two offenses charged are in law and fact the same offense."). Register has made no attempt to demonstrate that the source of the January 20 delivery was, in fact, the same stash found by the agents in Register's condominium on January 22. As Register openly acknowledges, "[t]he crucial factual question is whether [the defendant] continuously possessed cocaine or whether he had it in his possession on distinct occasions." *United States v. Fiallo–Jacome,* 784 F.2d 1064, 1066 (11th Cir. 1986).[7] Because Register has offered no

---

**6.** *United States v. Montos,* 421 F.2d 215, 219 n. 1 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); *accord United States v. Smith,* 543 F.2d 1141, 1145 (5th Cir.

1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977).

**7.** The Eleventh Circuit held in *Fiallo–Jacome* that an indictment which included two counts

evidence to establish that the cocaine in each of the two transactions came from a common "stash," we find no violation of the double jeopardy clause.

D. Application of the United States Sentencing Guidelines

1. *Aggregation of Controlled Substances not Included in the Count of Conviction*

The United States Sentencing Guidelines (Guidelines) provide that a sentencing court must consider a defendant's involvement with quantities of narcotics not charged in the indictment when such conduct was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). *See United States v. Byrd*, 898 F.2d 450, 452 (5th Cir.1990).[8]

In the instant case, the district court explicitly stated that it found credible Korycki's testimony that she had purchased cocaine from Register eight to ten times prior to the January 20 and January 22 transactions and would have no difficulty basing a finding on her testimony. Nevertheless, the district court stated that it would "just look at the immediate period of this particular offense and this particular conspiracy in the near time frame ... [al-

though] [i]t may well be it doesn't reflect the scale of Mr. Register's culpability." The district court therefore assigned to Register an offense level of 20, which corresponds to the amount of cocaine seized from Register on January 22. Had the district court aggregated that amount (218 grams) with the amount of drugs allegedly sold in previous transactions by Register to Korycki, Register would have been assigned, under the Guidelines, an offense level of 24.[9]

 This court will uphold a district court's sentence so long as it results from a correct application of the Guidelines to factual findings that are not clearly erroneous. *United States v. Sarasti*, 869 F.2d 805, 806 (5th Cir.1989). In this case, the district court failed to make a reviewable finding as to whether the relevant conduct extended back prior to January 20. This court cannot properly review the sentence imposed by the district court without a finding whether the conduct prior to the January 20 and 22 transactions was part of the same course of conduct as the offense of conviction. We therefore vacate the sentence and instruct the district court to (a) make a factual finding as to the relevant course of conduct and (b) apply the Guidelines accordingly.

of violations of 21 U.S.C. § 841(a)(1) was multiplicitous where one count charged continuous possession over a three-month period, and the other count charged an isolated possession of an amount taken from the amount charged in the first count, "and which was *included* in the amount charged in that first count." *United States v. Maldonado*, 849 F.2d 522, 524 (11th Cir.1988) (citing *Fiallo–Jacome*, 784 F.2d 1064 (11th Cir.1986)). The Eleventh Circuit in *Maldonado* distinguished the facts of *Fiallo–Jacome* from situations in which the offenses involve separate stashes of drugs. *See also United States v. Vaughn*, 859 F.2d 863, 865 (11th Cir. 1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989) (no double jeopardy where (a) separate charges of possessions of quantities of cocaine of varying purities on different dates, (b) no evidence to show continuous possession of only one quantity of cocaine, (c) no continuous possession charged, (d) each count required proof of a quantity of cocaine on different dates, and (e) no count charged an amount that was included in the charge in a different count).

8. *See also* U.S.S.G. § 1B1.3, comment. (backg'd.) ("[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."); U.S.S.G. § 2D1.4, comment. (n.2) ("Where ... the amount seized does not reflect the scale of the offense, the sentencing judge *shall* approximate the quantity of the controlled substance. In making this determination, the judge may consider ... similar transactions in controlled substances by the defendant....") (emphasis added).

9. The presentence report (PSI) recommended a base offense level of 24. This level was based on an aggregation of the amount of drugs seized from Register and the amount of drugs involved in prior transactions between Register and Korycki, because, according to the PSI, "the amount seized does not appear to reflect the scale of the overall offense."

### 2. Enhancement for Possession of a Firearm

 Guideline § 2D1.1(b) calls for the enhancement of a defendant's sentence by two levels if a dangerous weapon was "possessed during commission of the offense." The district judge in this case refused to enhance the sentence, however, because he found it "improbable that that weapon was *used* in the commission of this offense" (emphasis added). The policy statement to Guideline § 5K2.6 states that the court may increase the sentence above the authorized Guideline range "[i]f a weapon ... was used *or possessed* in the commission of the offense" (emphasis added). Moreover, the commentary to Guideline § 2D1.1(b)(1) states that the court should enhance a sentence for weapon possession "unless it is clearly improbable that the weapon was connected to the offense." [10]

This court has upheld upward adjustments for mere possession of a firearm. *See, e.g., United States v. Otero*, 868 F.2d 1412, 1414 (5th Cir.1989) ("firearm use or possession per se is a permissible basis for upward adjustment"); *United States v. Hewin*, 877 F.2d 3, 5 (5th Cir.1989) (mere possession of gun in car, notwithstanding acknowledgment by district judge that defendants probably never intended to use gun in connection with drug offense, sufficient basis for upward adjustment); *United States v. Mueller*, 902 F.2d 336, 345 (5th Cir.1990). While the decision to make an upward adjustment based on firearm possession appears to be somewhat discretionary, we find in this case that the district judge may not have applied the correct legal standard in exercising his discretion, as he may not have considered possession to be sufficient grounds for sentence enhancement. We therefore instruct the dis-

trict court on remand to apply the proper standard in determining whether an upward adjustment is appropriate in this case.[11]

### III. Conclusion

For the foregoing reasons, the convictions are AFFIRMED and the sentences VACATED and REMANDED for further proceedings consistent with this opinion.

---

**10.** The commentary provides in pertinent part: The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1, comment. (n.3).

**11.** We also direct the district court's attention to *United States v. Suarez*, 911 F.2d 1016 (5th Cir. 1990) and *United States v. Paulk*, 917 F.2d 879, 882–83 (5th Cir.1990) (following *Suarez*), in which we held that for crimes committed prior to November 1, 1989, the district court must make a finding of scienter before enhancing a defendant's sentence for firearm possession.