# United States Court of Appeals
## For the First Circuit

No. 08-1745

UNITED STATES OF AMERICA,

Appellant,

v.

MICHAEL A. SICILIANO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Stahl, and Lipez,
Circuit Judges.

Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.
Robert M. Strasnick, with whom Andrews & Updegraph, P.C. was on brief, for appellee.

August 26, 2009

**LIPEZ**, **Circuit Judge**.  After obtaining evidence that Michael Siciliano ("Siciliano") had ordered chemicals used in the manufacture of Methylenedioxymethamphetamine ("MDMA"), a controlled substance, agents from the Drug Enforcement Agency ("DEA") began an investigation.  While interviewing Siciliano in his residence with his consent, a DEA agent, along with other law enforcement officers, conducted a protective sweep of the apartment.  During the sweep, officers observed materials used in the manufacture of MDMA and a plastic bag containing an unidentified powder.  On the basis of an affidavit containing this information, agents obtained a search warrant and searched the premises.  Siciliano moved to suppress the evidence discovered in the search, arguing, inter alia, that the protective sweep was unlawful and that the agents would not have sought a warrant if they had not discovered what they believed to be contraband during the sweep.  The district court granted the motion to suppress, and then denied the government's motion for reconsideration on the basis of newly discovered evidence.

On appeal, the government argues that the district court clearly erred in finding that the agents would not have sought the search warrant if they had not made the protective sweep, and that the court abused its discretion in refusing to grant the motion for reconsideration.  After reviewing the record, we affirm.

"We recite the facts as found by the district court, consistent with record support." United States v. Vilches-Navarrete, 523 F.3d 1, 5 n.3 (1st Cir. 2008).

## A. The Investigation

In 2006, the Royal Canadian Mounted Police ("RCMP") informed the DEA that, in February 2005, Siciliano had purchased chemicals for use in manufacturing MDMA. The chemicals were delivered to 85 Surrey Street #1, in Brighton, Massachusetts. Sometime thereafter, the DEA issued an administrative subpoena to eBay Inc. ("eBay"), seeking the transaction history on an account registered to Siciliano at the Surrey Street address. eBay provided the DEA with a transaction log on the account for June 2002 to August 2006. The log included purchases of chemicals, glassware, and other equipment, all delivered to 85 Surrey Street #1. According to testimony from DEA Special Agent Anthony Roberto ("Agent Roberto"), the materials ordered are used in the manufacture of MDMA.

Agent Roberto testified at the suppression hearing that the information from RCMP and eBay was the basis for his investigation of Siciliano. After receiving the information from RCMP and eBay, he said, he decided to "obtain other evidence that there was manufacturing going on." In October 2006, Agent Roberto established surveillance at 85 Surrey Street #1, and followed

Siciliano from the apartment to nearby Northeastern University ("Northeastern"). Also in October, Agent Roberto looked through Siciliano's trash, and discovered financial statements bearing his name and the 85 Surrey Street #1 address. According to Agent Roberto's testimony, the discovery didn't "ha[ve] any bearing" on the purchase of chemicals, and he did not apply for a warrant as a result of what was found. At that time, he testified, he did not know whether there was an MDMA lab on the premises or not, and he had never observed anyone come to the apartment to purchase drugs.[1]

On November 16, 2006, Agent Roberto, accompanied by DEA Special Agent David DiTulio ("Agent DiTulio"), went to the apartment at 85 Surrey Street #1.[2] Both agents wore plain clothes but were displaying their DEA badges. When the agents knocked on the door, Siciliano answered. The agents identified themselves and asked if he was Michael Siciliano. Siciliano initially denied his identity, but then admitted it after the agents produced a copy of his driver's license photo. Agent Roberto told Siciliano that they wanted to ask him some questions, and Siciliano invited them in.

---

[1] As Agent Roberto acknowledged at the suppression hearing, the possession of these chemicals is not in itself unlawful. In contrast, using the chemicals to manufacture a controlled substance is unlawful. See 21 U.S.C. § 841(a)(1).

[2] At the suppression hearing, Agent DiTulio spelled his named "DiTullio." To avoid confusion, we use the same spelling of the name as the district court and the government.

-4-

The agents entered the apartment and followed Siciliano down a hallway leading to the rear of the residence. Halfway down the hallway, Agent DiTulio turned around and headed back out the door onto the porch, where he motioned to four law enforcement officers who had been waiting in their cars on the street. Agent DiTulio told the officers that Siciliano had agreed to speak with "us" and that they could come in. The officers entered the apartment and, along with Agent DiTulio, conducted a protective sweep of the premises. Three officers started in the front of the apartment, while two went to the rear. In the front, Agent DiTulio and Boston Police Detective Kevin M. Guy ("Detective Guy") opened the first doorway on the left, which led to Siciliano's bedroom. In the bedroom, Agent DiTulio found a dresser. The bottom drawer of the dresser was open, and in it Agent DiTulio observed an empty package of gelatin capsules. Elsewhere, in the "office," DEA Group Supervisor Jonathan Scheffler observed a plastic bag containing powder. The powder was not field-tested. Officers in the rear of the apartment discovered one of Siciliano's roommates in a bedroom adjacent to the kitchen.

Meanwhile, Agent Roberto continued to follow Siciliano down the hallway, which led to the kitchen at the rear of the apartment. As they walked, Agent Roberto asked Siciliano if there was anyone else in the apartment. Siciliano replied first that there was not, and then said that he was not sure and did not know.

In the kitchen, Agent Roberto told Siciliano that he wanted to talk about orders of chemicals. Siciliano claimed that he had not ordered any chemicals. Agent Roberto said that he had, and Siciliano disagreed, whereupon Agent Roberto said that he had a list of Siciliano's purchases. Siciliano said that the orders had taken place six years ago, but when Agent Roberto disagreed, he said they occurred four years ago. At this point, the other officers in the apartment had completed their protective sweep and joined Agent Roberto in the kitchen.

Agent Roberto told Siciliano that the chemical orders had occurred that year. Siciliano said that the purchases had been for "Frank," a person he knew from Northeastern. Agent Roberto asked for Frank's last name, address, and phone number, but Siciliano could not or would not provide the information. By this point, Siciliano had become hostile; he was yelling, and, at one point, he pushed Agent Roberto. When one of the officers asked Siciliano if they could search the apartment, Siciliano said no. The officers, along with Siciliano, then left the apartment. Siciliano told the officers that he wanted to call his mother and an attorney. During Siciliano's phone call, Agent Roberto overheard Siciliano say that he "did something stupid" and "ordered chemicals."

Agent Roberto and Agent DiTulio testified that they then decided to "freeze" the apartment.[3] Agent Roberto testified that what led him to freeze the apartment was "[p]art of the interview and part what was observed during the protective sweep." Agent DiTulio testified that "a series of factors led to us freezing the apartment. . . . [T]here were conflicting statements, along with what we saw during the protective sweep." While two officers kept the apartment "frozen," Agent Roberto, Agent DiTulio, and the other officers left to seek a warrant.

Detective Guy prepared the affidavit supporting the warrant application. The affidavit set forth the information obtained from RCMP and eBay, Siciliano's evasive responses to questioning from the officers, his agitated demeanor, the gel capsules and powder observed during the protective sweep, and the overheard contents of the phone call. The warrant was issued and the search executed the same day. In Sicilano's bedroom, officers discovered 1.3 grams of 82 percent pure MDMA, a digital scale, plastic baggies, a plastic spatula, and the gel capsules observed earlier. In the apartment office, the officers discovered documents containing pictures and text describing how to make MDMA. Next to the documents were two computers and a hard drive, which

---

[3] As we explained in United States v. Dessesaure, "[t]he goal of a 'freeze' . . . is to secure a location to prevent its occupants from destroying evidence while a search warrant is being obtained." 429 F.3d 359, 363 (1st Cir. 2005). See infra section II(A)(2).

-7-

the officers seized. The officers also located a basement in the apartment, where they discovered glassware and chemicals consistent with the manufacture of MDMA. Siciliano was arrested on state charges of possession with intent to distribute controlled substances.

In March 2007, several months after the search of the apartment, DEA computer forensic examiner Jill Mossman began a search of the seized computers pursuant to a second warrant issued specifically for that purpose. During the course of this search, she discovered what she believed to be files containing child pornography. After additional investigation not material here, a third warrant was obtained to search the computers for child pornography.

## B. District Court Proceedings

In May 2007, Siciliano was indicted by a federal grand jury, and the state charges were dismissed. The federal indictment charged Siciliano with, among other things, possessing child pornography and attempting to manufacture MDMA. On August 15, 2007, Siciliano filed a motion to suppress the evidence obtained in the November 16, 2006 search of his apartment and the subsequent search of his computers. The government opposed the motion, and hearings were held on February 14 and 15, 2008.

On March 14, 2008, the district court issued an order granting the motion to suppress. The court held that Siciliano had

not given consent for the four officers waiting on the street to enter his apartment, and that the protective sweep performed by the officers and Agent DiTulio was unlawful. Applying the rule set out in Dessesaure, 429 F.3d at 359, the court concluded that, because information obtained during the sweep had been incorporated into the affidavit supporting the November 16 warrant, the evidence obtained pursuant to that warrant should be suppressed unless (1) after excising the unlawfully obtained information from the warrant affidavit, there remained information sufficient to establish probable cause; and (2) the warrant would have been sought even if the illegal entry had not occurred. See Dessesaure, 429 F.3d at 367. The court concluded that probable cause still existed, but found that the government had failed to establish that the officers would have sought a warrant absent their discovery, during the protective sweep, of gel capsules and powder in the apartment.

On April 11, 2008, the government filed a motion for reconsideration of the district court's order. Among other things, the government stated that it had discovered the existence of a draft warrant affidavit, prepared by Agent Roberto in October 2006. The government attached an affidavit from Agent Roberto discussing the preparation of the draft affidavit and stating that he had intended to apply for a search warrant once the interview was completed. Siciliano opposed the motion for reconsideration, arguing that the agents' intention to seek a warrant was a factual

determination that had been properly made on the basis of testimony at the suppression hearing. On May 22, 2008, the district court denied the government's motion in a written order, stating, among other things, that it was "not inclined to reconsider its determination that the officers would not have sought a warrant absent the protective sweep."

The government then filed this interlocutory appeal. It does not challenge the district court's determination that the protective sweep was unlawful. Instead, the government argues (1) that the district court committed clear error in finding that the agents would not have sought a warrant absent the information obtained from the protective sweep, and (2) that the court abused its discretion in denying the motion for reconsideration. Siciliano opposes the government on both counts, and offers an alternative ground for affirmance based on the government's search of the computers for child pornography.

## II.

We apply a mixed standard of review to the district court's suppression order. We review "the court's findings of fact for clear error and the application of the law to those facts de novo." Vilches-Navarrete, 523 F.3d at 12 (internal quotation marks and citation omitted). "To find clear error, an inquiring federal court must form a strong, unyielding belief, based on the whole of the record, that a mistake has been made." In re Grand Jury

Investigation, 545 F.3d 21, 24 (1st Cir. 2008). We affirm under the clear error standard "if any reasonable view of the evidence supports" the district court's finding. United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009).

**A. The Decision to Seek the Warrant**

1. Legal principles

The exclusionary rule prohibits the introduction into evidence of tangible materials and knowledge acquired during an unlawful search. Murray v. United States, 487 U.S. 533, 536 (1988). In addition, the exclusionary rule prohibits the introduction of "tangible and testimonial" evidence "that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." Id. at 536-37 (internal quotation marks and citation omitted). In this case, Siciliano argued that the exclusionary rule should bar introduction of the evidence obtained during the November 16 search and subsequently obtained in the search of the seized computers, since the November 16 search warrant was based on an affidavit containing information obtained during the unlawful protective sweep.

However, under the independent source doctrine, "evidence acquired by an untainted search which is identical to . . . evidence unlawfully acquired" is admissible. Id. at 538 (emphasis

-11-

omitted). In this context, the question is whether the November 16 search was an independent source of the evidence discovered as a result of the unlawful protective sweep. Where, as here, a search warrant is supported by an affidavit containing unlawfully obtained information, the independence of the search depends on two factors: "(1) whether the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, and (2) whether the affidavit contained sufficient facts to support probable cause when the offending facts were excised." Dessesaure, 429 F.3d at 367 (internal quotation marks and citation omitted).

It is the government's burden to establish, by a preponderance of the evidence, that the search was an independent source of the evidence in question. United States v. Forbes, 528 F.3d 1273, 1279 (10th Cir. 2008) ("The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence."); United States v. Lewis, 738 F.2d 916, 920-21 (8th Cir. 1984) (same); United States v. Bonczeck, No. 08 Cr. 361 (PAC), 2008 U.S. Dist LEXIS 87436, at *17 (S.D.N.Y. Oct. 16, 2008) (same); United States v. Nguyen, No. 07-10050-PBS, 2008 WL 346114, at *4 (D. Mass. Feb. 7, 2008) (applying preponderance standard to Dessesaure inquiry); cf. Nix v. Williams, 467 U.S. 431, 444 & n.5 (1984) ("If the prosecution can establish by a preponderance of the evidence that

the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received.").[4]

Moreover, as the government acknowledges, the court's determination of the first Dessesaure prong -- whether the agents' decision to seek the warrant was prompted by unlawfully acquired information -- is a factual finding subject to clear error review. See Dessesaure, 429 F.3d at 369 (describing the "factual determination as to the police officers' intent" to seek a warrant); United States v. Stierhoff, 477 F. Supp. 2d 423, 450 (D.R.I. 2007) (quoting "factual determination" language from Dessesaure); cf. United States v. Gonzalez, 555 F.3d 579, 582 (7th Cir. 2009) (holding that, for purposes of the identical inquiry under Murray, "it was not clear error, based on the record before us, for the district court to find that the officers would have sought a warrant had the box not been opened"); United States v. Restrepo, 966 F.2d 964, 972 (5th Cir. 1992) (describing the Murray determination of whether the officers were prompted to seek the warrant because of unlawfully obtained information as "a question

_____

[4]    As Justice Scalia explained in Murray, the inevitable discovery doctrine is a close relative of the independent source doctrine. Murray, 487 U.S. at 539. Under the inevitable discovery doctrine, unlawfully obtained evidence that "inevitably would have been discovered by lawful means" is admissible. Nix, 467 U.S. at 444. Because unlawfully obtained evidence so admitted is not in fact lawfully "rediscovered," but only inevitably would have been, it is not admissible under the independent source doctrine, which requires lawful discovery of the evidence. See Murray, 487 U.S. at 538-39.

-13-

of fact"); <u>United States</u> v. <u>Halliman</u>, 923 F.2d 873, 880 (D.C. Cir. 1991) (Clarence Thomas, J.) ("The district court first found that the officers had not decided to obtain the emergency warrant on the basis of what they had seen in room 900. That finding is not clearly erroneous." (citation omitted)).

Clear error review is appropriate because, as we have said, the first prong of <u>Dessesaure</u> is "subjective," concerning "the police officers' intent," in contrast to the objective determination of probable cause under the second prong. <u>Dessesaure</u>, 429 F.3d at 369; <u>cf.</u> <u>Restrepo</u>, 966 F.2d at 972 ("[U]nlike the objective test of whether the expurgated affidavit constitutes probable cause to issue the warrant, the core judicial inquiry before the district court . . . is a subjective one: whether information gained in the illegal search prompted the officers to seek a warrant . . . ."). To be sure, although the inquiry is subjective, proof "should not be . . . by purely subjective means," and the district court must assess "the totality of the attendant circumstances" in determining the plausibility of the officers' "assurances." <u>Dessesaure</u>, 429 F.3d at 369. In so doing, the court may assume that the officers are reasonable, and would have intended to act as a "reasonable officer" would act in the circumstances. <u>See</u> <u>United States</u> v. <u>Silva</u>, 554 F.3d 13, 19 (1st Cir. 2009). Nevertheless, the ultimate determination of the officers' intent is a subjective one, and must remain distinct from the other <u>Dessesaure</u> prong -- the objective determination of

-14-

whether there existed probable cause to search absent the unlawfully obtained information.  As Murray itself illustrated, the inquiries may point in different directions.  See Murray, 487 U.S. at 542 (holding that, where probable cause to search had not been challenged, the question of whether the search was "in fact a genuinely independent source" depended in part on what prompted the agents to seek a warrant).[5]

2. Application to this case

a. Legal error

We address first the government's argument that the district court committed a legal error in conducting the independent source inquiry.  The government writes: "The focus of the independent source inquiry is not on whether the officers in fact considered tainted information (as the court appears to have thought), but 'whether [the warrant] would have been sought even if what actually happened had not occurred.'"  We agree that it would

_____

[5] The government notes in its brief that in Dessesaure we reserved the question of whether subsequent decisions by the Supreme Court that "eschewed use of subjective intent in certain Fourth Amendment analyses . . . have affected the subjective analysis mandated by the first prong of Murray." Dessesaure, 429 F.3d at 369 n.9.  We did not reach this question in Dessesaure because it was unnecessary for the resolution of the case.  We again decline to reach the question, though for a different reason. The Supreme Court has repeatedly instructed lower courts that only it has the prerogative to overrule its own decisions. Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, Ill., 567 F.3d 856, 857 (7th Cir. 2009) (Easterbrook, C.J.) ("Repeatedly . . . the Justices have directed trial and appellate judges to implement the Supreme Court's holdings even if the reasoning in later opinions has undermined their rationale." (citing Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989)).

have been legal error for the court to conclude that the November 16 search was not an independent source because the agents relied in fact on tainted information in seeking the search warrant. See Dessesaure, 429 F.3d at 367. But there is no indication that the district court believed that this was the relevant inquiry. Rather, the court cited the agents' testimony that they were "led . . . to" seek the warrant by "the combination of Siciliano's statements and the items observed during the protective sweep." From this testimony, along with other evidence in the record, the court concluded that "the government has not established that the officers would have sought the warrant absent the knowledge that gel capsules and powder were in the apartment." The legal standard employed by the court is precisely the one we recommended in Dessesaure: "'[O]ne must ask whether [the warrant] would have been sought if what actually happened [i.e., the unlawful search] had not occurred.'" Dessesaure, 429 F.3d at 369 (quoting Murray, 487 U.S. at 542).

### b. Factual error

The core of the government's argument on appeal is that the district court clearly erred in concluding that the government did not establish that the agents were not prompted to seek the November 16 search warrant by information acquired during the unlawful protective sweep. The government makes two related arguments to this end. First, it argues that the district court clearly erred in stating that the agents testified that "it was the

-16-

combination of Siciliano's statements <u>and</u> the items observed during the protective sweep that led them to seek the search warrant." According to the government, the agents testified only that these factors led them to <u>freeze</u> the apartment. Second, the government argues that the record does not support the contention that the gel capsules and powder observed during the protective sweep were "pivotal" to the agents' decision to seek the search warrant. In support of this claim, the government points out that Siciliano's demeanor and evasive answers to questions during the interview would have made it unlikely, in the agents' minds, that the chemicals were purchased for a lawful purpose. Moreover, there would have been little reason for the agents to wait to seek a warrant, since after the interview Siciliano knew he was being investigated, and would have stopped criminal activity and might have destroyed evidence.

### i. The agents' testimony

As we have previously explained, officers freeze a property because they intend to seek a warrant and wish to preserve evidence. <u>Dessesaure</u>, 429 F.3d at 363. For this reason, testimony as to why officers froze a property may also reveal why they sought a search warrant. Here, Agent Roberto testified that what "led to the premises being frozen" was "[p]art . . . the interview and part what was observed during the protective sweep." Agent DiTulio testified that what "led to us freezing the apartment" was a "series of factors," namely, "the conflicting statements, along

-17-

with what we saw during the protective sweep." The factors cited are plainly relevant to a decision to seek a warrant. They would suggest, to a reasonable officer, the presence of criminal activity.

Moreover, the agents' testimony on this point does not necessarily imply that they would have sought the search warrant if the protective sweep had not occurred. Agent Roberto's testimony that what led to the freezing was "[p]art . . . the interview and part what was observed" might have meant that the interview and the protective sweep were each sufficient to prompt him to seek the warrant -- in other words, that he sought the warrant for two independent reasons. However, Agent Roberto also might have meant that the combination of the interview and the protective sweep prompted him to seek the warrant, such that he would not have sought the warrant if either condition were absent. It was the government's burden to rule out the second interpretation. For reasons we explain below, it was not clear error for the district court to choose that interpretation.

ii. The significance of the protective sweep

Contrary to the government's suggestion, the district court's conclusion that the agents might not have sought the November 16 search warrant if the protective sweep had not occurred is well supported by the record. At the suppression hearing, Agent Roberto testified that after receiving information from RCMP and eBay, he was not concerned "about the chemicals being in

[Siciliano's] house," and decided to "obtain other evidence that there was manufacturing going on." Surveillance and the trash pull did not provide the agents with this evidence. According to testimony at the suppression hearing, the agents did not observe Siciliano interact with anyone while under surveillance. The results of the trash pull did not have "any bearing" on the chemical ordering, and Agent Roberto testified that he did not apply for a warrant "as a result of what [was] found." As of November 16, the date of the interview, Agent Roberto testified that he had no knowledge that anyone had visited Siciliano's apartment to purchase drugs. While Agent Roberto had concluded that "chemicals were delivered" to 85 Surrey Street #1, he remained uncertain about the manufacturing of MDMA on the premises. When asked, "There could have been a lab. There might not have been. You didn't know, did you?," he agreed.

This testimony suggests that the agents desired to obtain evidence, besides the record of chemical orders, of MDMA manufacturing in the apartment before seeking a warrant. Yet nothing that occurred between August and November 16, 2006, provided the agents with that evidence. Moreover, the November 16 interview itself, while strongly suggestive of criminal wrongdoing, also did not supply the agents with evidence of manufacturing at Siciliano's address. During the interview, Siciliano told the agents that he had purchased the chemicals for someone named "Frank," whose identifying information he did not disclose.

Reasonable agents might have concluded that while Siciliano was involved in drugs, manufacturing was not occurring at the 85 Surrey Street #1 address. After all, they had investigated the address for over a month and discovered nothing. As the district court noted, the only evidence of drugs on the premises was discovered during the protective sweep. It was thus the protective sweep that provided the agents with what they sought -- further evidence that Siciliano was involved in manufacturing MDMA on the premises.

Moreover, absent evidence of drugs or chemicals in the Surrey Street apartment, the agents may not have been concerned, as the government suggests they were, with the destruction of evidence at that location. Indeed, the district court could fairly infer that the fear of the officers that Siciliano would destroy physical evidence was generated by the physical evidence observed during the protective sweep.

The record, as it existed at the time of the suppression hearing, does not leave us with a "strong, unyielding belief" that the district court erred in concluding that the government did not establish that the agents would have sought the November 16 warrant even if the unlawful protective sweep had not occurred. Rather, the district court's finding is supported by "a reasonable view of the evidence" -- testimony from both Agent Roberto and Agent DiTulio about what led them to freeze the premises, as well as testimony about the goal of the investigation and earlier decisions not to seek a warrant. Therefore, the district court did not

commit clear error. Pursuant to <u>Dessesaure</u> and the district court's findings, the November 16 search was not an independent source of the evidence discovered in the apartment and subsequently on the seized computers. <u>See</u> <u>Dessesaure</u>, 429 F.3d at 367. The evidence was therefore rightly suppressed.

## B. The Government's Motion for Reconsideration

The district court's denial of a motion to reconsider is reviewed for abuse of discretion. <u>United States</u> v. <u>Roberts</u>, 978 F.2d 17, 20 (1st Cir. 1992). A district court abuses its discretion when "a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." <u>Id.</u> at 21.

When faced with a motion for reconsideration, district courts should apply an interests-of-justice test. <u>See</u> <u>Greene</u> v. <u>Union Mut. Life Ins. Co. of Am.</u>, 764 F.2d 19, 23 (1st Cir. 1985). The government contends that, under our decision in <u>Roberts</u>, district courts should consider seven "rules of thumb" in making the interests-of-justice determination. It insists that the district court's ruling is inconsistent with the reasoning of <u>Roberts</u>, and that the court abused its discretion by failing to consider all of the issues presented in the government's motion. In particular, in that motion, the government argued that it had discovered new evidence of dispositive significance for the

defendant's prior motion to suppress. Attached to the government's motion was an affidavit from Agent Roberto stating that he had prepared a draft affidavit in October 2006 to support a search warrant for the 85 Surrey Street #1 apartment, and that he had intended to apply for a warrant once the November 16 interview was completed.

The district court did not abuse its discretion in denying the motion for reconsideration. First, the Roberts factors, on which the government's analysis heavily relies, are neither necessary to determining the interests of justice in every evaluation of a motion for reconsideration, nor are they particularly appropriate in this case. See Roberts, 978 F.2d at 22. In Roberts, a district court summarily granted the defendant's motion to suppress after the government failed to timely file an opposition, missing the deadline by several days. Id. at 18. The government moved for reconsideration, explaining that it had misinterpreted the local rule governing filing deadlines. The court accepted the government's explanation and agreed to reconsider, but nevertheless refused to determine the suppression issue on the merits, concluding that the circumstances constituted neither "good cause" nor "excusable neglect" for the late filing. Id. at 19.

We vacated the court's order. Id. at 20. After reaffirming that motions for reconsideration are subject to an interests-of-justice test, we stated, "[i]n determining this motion

-22-

to reconsider the court's response to the <u>belated filing</u> before us, it would have helped had the district court examined the following seven factors . . . ."[6] <u>Id.</u> at 21 (emphasis added). Predictably, several of these factors concerned timeliness, the reason for the late filing, and prejudice to the other party because of the late filing. As we explained, "[w]e do not say that courts must necessarily look at each and all of these factors in every case, or that courts cannot, in a proper case, examine other factors." <u>Id.</u> at 22.

Indeed, in a recent case examining a district court's denial of a motion to reconsider based on new evidence, we did not mention the <u>Roberts</u> factors. <u>See</u> <u>Douglas</u> v. <u>York County</u>, 360 F.3d 286, 290-91 (1st Cir. 2004); <u>see</u> <u>also</u> <u>Ruiz-Rivera</u> v. <u>IRS</u>, 93 Fed. Appx. 244, 246 (1st Cir. 2004) (applying interests-of-justice test without discussing <u>Roberts</u>). Moreover, the government did not ask the district court to apply the <u>Roberts</u> factors to its motion below. There is thus no reason to conclude, as the government suggests we should, that "the [district] court's failure to address substantively the <u>Roberts</u> factors . . . undercuts the deference

---

[6] The seven factors we identified were: (1) nature of the case, (2) degree of tardiness, (3) reasons for tardiness, (4) character of the omission, (5) prejudice, (6) institutional interests, and (7) utility of the pleading. <u>See</u> <u>Roberts</u>, 978 F.2d at 22-23.

-23-

that would ordinarily be due a district court's order denying reconsideration."[7]

Moreover, in contrast to Roberts, this case does not concern an initial order summarily entered after one party failed to make a timely filing. Instead, we have a fully reasoned decision entered after a suppression hearing. Also, the language of the court's order denying the motion for reconsideration suggests that the court did test the government's arguments against the merits of its earlier suppression decision, but simply decided not to change its position. Consequently, several of the Roberts factors -- "degree of tardiness," "reasons for tardiness," and the "utility of the pleading" -- do not apply because the court never asked why the government had not presented the newly discovered evidence at the time of the suppression hearing. Instead, the court's order denying the motion for reconsideration appears to have reflected an evaluation of the merits of the suppression order in light of the arguments made in the motion for reconsideration.

The government's suggestion that the district court "simply did not consider the issues presented in the government's

_____

[7]    To be sure, Siciliano does not contest the government's argument that the Roberts factors apply to this case. For the purposes of our own analysis, however, we are not bound by the way the parties have analyzed an issue when we conclude their analysis is legally incorrect. Cf. Doe v. Anrig, 728 F.2d 30, 32 (1st Cir. 1984) (Breyer, J.) ("We are, of course, free to affirm a district court's decision on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below." (internal quotation marks and citation omitted)).

-24-

motion" is unfounded. In fact, in its order denying the motion for reconsideration, the district court discussed the substance of some of the government's claims. The government had asked the district court to revisit its holding that the protective sweep was unlawful because the agents who performed the sweep lacked an articulable basis for suspecting that the apartment harbored dangerous individuals. The government argued that the district court should consider the "collective knowledge" of the officers in the apartment, including Agent Roberto, who was aware of Siciliano's conduct during the interview and thus did have an articulable basis for suspecting that there could be others in the apartment involved in manufacturing MDMA who posed a danger to the officers. In its motion denying reconsideration, the court analyzed the government's argument. It concluded that the argument did not require it to revise its previous holding, since even if the "collective knowledge" doctrine applied, the officers who conducted the sweep were summoned <u>before</u> Agent Roberto began the interview.

Notably, the government does not appeal the district court's treatment of the collective knowledge issue. Instead, because the court's order does not include a similarly detailed analysis of its rejection of the significance of the October 2006 draft affidavit, the government argues that the court abused its discretion in denying the motion for reconsideration. The premise of this argument -- that a court denying a motion for reconsideration must offer a reasoned explanation of its

-25-

disposition of every argument made in the motion, or otherwise risk abusing its discretion -- is hopeless. See Roque-Rodriguez v. Lema Moya, 926 F.2d 103, 105 & n.3 (1st Cir. 1991) (noting that, in the Rule 56 context, a district court's "deni[al] [of a] motion without explanation" is "permissible" (citing Domegan v. Fair, 859 F.2d 1059, 1065-66 (1st Cir. 1988)); Earnhardt v. Puerto Rico, 744 F.2d 1, 3 (1st Cir. 1984) (district court did not abuse discretion by declining to give reasons for denying motion to alter or amend judgment, but "we must assume that the motion received careful consideration").

Moreover, even in the absence of an explanation of the court's reasons for rejecting the significance of Agent Roberto's affidavit, the language of the court's order suggests that it did consider all of the arguments but chose to address one specifically: "The court is not inclined to reconsider its determination that the officers would not have sought a warrant absent the protective sweep. With regard to the government's collective knowledge argument . . . ."

Also, the government has overstated the legal significance of the October 2006 draft affidavit. Contrary to the government's assertion, none of the cases cited stand for the proposition that the mere existence of a partially completed "draft affidavit," written sometime before the execution of an unlawful search, proves that the government would have sought the subsequent search warrant regardless of the unlawful search. Rather, in the

-26-

authorities cited by the government, officers were actively preparing a search warrant affidavit when an unlawful search occurred. See United States v. Hobbs, 509 F.3d 353, 362 (7th Cir. 2007) (officers writing affidavit at the same time unlawful search occurred); United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995) (officers "had been preparing the search warrant affidavit for several days prior to the garage entry, and added the observations from that illegal entry only at the last moment").[8] From the fact that the officers were actively preparing a search warrant affidavit, as well as other facts, the courts inferred that the officers would have acquired the warrant even if the unlawful search had not occurred. See, e.g., Hobbs, 509 F.3d at 357-58 (describing how, while two officers "met at the Peoria Police Department to prepare a complaint for a search warrant for [the defendant's] home," other officers independently conducted an unlawful search of the home).

Here, in contrast, Agent Roberto testified at the suppression hearing that he decided not to obtain a warrant after

---

[8] The government cites United States v. Register, 931 F.2d 308, 311 (5th Cir. 1991), in support of its position, but this case is not on point. The Register court was not expressly analyzing whether the officers would have sought the warrant had the unlawful search not occurred, and noted that the unlawfully obtained information was not included in the search warrant affidavit, in contrast to this case. Id. In another case cited by the government, United States v. Salas, 879 F.2d 530, 538 (9th Cir. 1991), the record contained "uncontradicted" subjective evidence that the officers had decided to obtain the search warrant in question before the unlawful entry occurred. Id.

completing the trash pull, which occurred on October 30, 2006. Instead, he had decided to seek "other evidence that there was manufacturing going on," and, as he characterized the trash pull, it did not have "any bearing" on the chemical ordering. Thus, even if Agent Roberto drafted an affidavit for a search warrant sometime in October 2006, he decided after that point not to obtain a warrant because he lacked evidence of manufacturing. In short, the October 2006 draft warrant is not dispositive evidence that the officers would have sought the November 16 search warrant even if they had not observed gel capsules and powder during the protective sweep.

For all of the reasons stated, the district court did not abuse its discretion in concluding that the government's submission did not require it to reconsider its determination that the officers would not have sought a warrant without the evidence discovered during the unlawful protective sweep.

Affirmed.

**- Dubitante Opinion Follows -**

**BOUDIN**, **Circuit Judge**, **dubitante**.  In May 2006, Drug Enforcement Administration ("DEA") agents obtained a detailed tip from Canadian police that in February 2005 a Canadian company had shipped chemicals ordered by Michael Siciliano, which were delivered to 85 Surrey Street, Apartment #1 in Brighton, Massachusetts.  The chemicals were useful in the manufacture of methylenedioxymethamphetamine ("MDMA" or "ecstasy"), a drug unlawful under U.S. law.  DEA then subpoenaed eBay's records for an account registered to Siciliano at the 85 Surrey Street address.

The records revealed ten purchases by Siciliano  between January 2004 and August 2006 of chemicals, glassware, and laboratory equipment consistent with manufacture of MDMA; the glassware included a specialized type designed for this purpose. DEA agents kept sight of Siciliano and collected trash from his apartment building, confirming that he resided at 85 Surrey Street. At this point, given the recency of several of the eBay orders, the officers had some reason to think that drug manufacturing paraphernalia and chemicals would likely be found in the apartment.[9]

---

[9] Later, one agent stated he began preparing an affidavit in support of a warrant application in October 2006, after discovering the eBay transaction log but before the surveillance and trash collection.  However, the evidence of his affidavit preparation was first presented in the government's motion to reconsider the district court's suppression order and the district court was permissibly unsympathetic to such belated evidence.  See F.A.C., Inc. v. Cooperativa de Seguros de Vida de Puerto Rico, 563 F.3d 1, 2-3 (1st Cir. 2009); NLRB v. Magnesium Casting Co., 427 F.2d 114, 118 (1st Cir. 1970).

On November 16, 2006, the agents interviewed Siciliano at his apartment; Siciliano behaved suspiciously, offering various lies, evasions, and finally an admission that he had ordered chemicals.  However, at this point the agents stumbled: although two DEA agents had been invited into Siciliano's apartment when they asked to speak with him, four other agents entered--uninvited by Siciliano--and Siciliano refused to consent to a search of the apartment.  The agents engaged in a protective sweep of the apartment, which was arguably pretextual but in any case conducted in part by agents who had not been invited.

The sweep revealed plain-sight evidence, including gel capsules and powder potentially associated with MDMA production. The agents promptly sought such a warrant with a supporting affidavit that recounted--along with the Canadian tip, eBay records, and Siciliano's behavior in the interview--the further confirmatory evidence observed during the sweep.  When the warrant issued, agents completed their search, which yielded firm evidence of unlawful drug activity;[10] the agents also seized two computers in the apartment later found to contain child pornography.

Siciliano was indicted for drug offenses and possession of child pornography, and he moved to suppress the evidence seized in the search.  The district court held that the sweep had been

---

[10]The evidence included 1.3 grams of 82% pure MDMA, a digital scale, plastic baggies, a plastic spatula, gelatin capsules, documents containing instructions for manufacturing MDMA, and chemicals and glassware consistent with MDMA production.

unlawful, that reliance on its fruits contaminated the warrant application and that no exception rescued the search. <u>United States v. Siciliano</u>, No. 07-10146, 2008 WL 724032, at *5-6, *8-9 (D. Mass. Mar. 14, 2008). The court suppressed the evidence seized in the warrant-based search as well as the original sweep evidence. The panel now sustains the district court's action.

With exceptions, the exclusionary rule bars the use of evidence acquired as a result of an unlawful search.[11] The exception relevant here, confusingly associated with the phrase "independent source," amounts to this: reliance on wrongfully obtained evidence to secure a warrant does not matter if (a) the remaining validly provided evidence in the affidavit creates probable cause for the later search and (b) the police would have sought the warrant even if the wrongfully obtained evidence had never been acquired. <u>Murray</u>, 487 U.S. at 536-37, 542; <u>United States</u> v. <u>Dessesaure</u>, 429 F.3d 359, 367 (1st Cir. 2005).

In this case, the affidavit easily established probable cause--not itself a demanding standard, <u>L.A. County</u> v. <u>Rettele</u>, 550 U.S. 609, 615 (2007) (per curiam)--<u>without</u> regard for the sweep evidence. The tip and the nature and quantities of the shipments

---

[11] <u>Mapp</u> v. <u>Ohio</u>, 367 U.S. 643 (1961); <u>Boyd</u> v. <u>United States</u>, 116 U.S. 616 (1886); <u>see</u> 35 Geo. L.J. Ann. Rev. Crim. Proc. 186-201 (2006). For exceptions, see <u>Murray</u> v. <u>United States</u>, 487 U.S. 533, 536-38 (1988) (independent source exception); <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 913, 919-21 (1984) (good faith exception); and <u>Nix</u> v. <u>Williams</u>, 467 U.S. 431, 444-47 (1984) (inevitable discovery exception).

(shown by eBay records) to a private address were arguably enough, see, e.g., United States v. Hofstatter, 8 F.3d 316, 319-20, 322 (6th Cir. 1993) (per curiam); United States v. Coppage, 635 F.2d 683, 685 (8th Cir. 1980); Siciliano's lies and evasions were icing on the cake. Thus, the suppression order rested on the district court's separate finding that the agents failed to show that, absent the sweep evidence, they would have sought a warrant.

Murray's "would have sought" test has been treated as directed to the police officers' state of mind, Dessesaure, 429 F.3d at 369, but objective evidence of what reasonable officers would have done--as in many contexts, see Devenpeck v. Alford, 543 U.S. 146, 154-55 (2004)--is highly relevant where subjective evidence is absent (or to buttress or rebut direct testimony as to intent).[12] Indeed, in "the usual case," where subjective evidence is absent, "a court must infer [the police officers'] motivation from the totality of facts and circumstances." Restrepo, 966 F.2d at 972.

Here, one would think that a reasonable police officer would have sought a warrant after the interview even if no sweep had occurred. The agents already had evidence amply providing probable cause; and, Siciliano now having been alerted to their interest in him and the apartment, they could hardly have deferred

---

[12]See United States v. Silva, 554 F.3d 13, 19 (1st Cir. 2009); Dessesaure, 429 F.3d at 369; United States v. Chaves, 169 F.3d 687, 693 (11th Cir. 1999); United States v. Restrepo, 966 F.2d 964, 972 (5th Cir. 1992).

-32-

seeking a warrant to investigate further, lest Siciliano now destroy or conceal any evidence in the apartment.  As the agents were not asked what they would have done absent the sweep, the objective likelihood favors the government's position.  The district court concluded otherwise for two reasons.

First, it emphasized--not quite accurately[13]--that two of the agents had testified that "the combination of Siciliano's statements and the items observed during the protective sweep . . . led them to seek the search warrant." Siciliano, 2008 WL 724032, at *8.  No doubt the agents subjectively relied on everything incriminating that they had found to date (how could it be otherwise), but this offers no reasonable inference, either way, as to what they would have done in the absence of the sweep evidence. Cf. United States v. Lauzon, 938 F.2d 326, 331 (1st Cir. 1991).

The case law makes quite clear that reliance on unlawful evidence is not enough for suppression; the critical question, where the evidence was not essential to probable cause, is whether the officers would have sought the warrant even if the unlawful evidence had not been available.  See Murray, 487 U.S. at 542 n.3; Dessesaure, 429 F.3d at 367, 369.  The independent source rule in

---

[13] As the government points out, the transcript shows that the agent testimony was directed to the reason for the freeze, not the warrant; and the evidence discovered in the sweep would have been especially relevant to the concern to prevent destruction of evidence via the freeze.  Whether or not the freeze was itself unlawful does not affect the outcome here.  See Segura v. United States, 468 U.S. 796, 816 (1984).

-33-

this respect, although less demanding, acts very much like the harmless error test by disregarding a mistake that did not alter the outcome.

The district court's second stated reason was that the gel capsules and powder found during the sweep were "the only concrete indication that the previously-delivered chemicals might still be on the premises." Siciliano, 2008 U.S. Dist. LEXIS 20152, at *25. But nothing more "concrete" than the deliveries of such materials in bulk to the apartment in recent months was required for such probable cause, see Hofstatter, 8 F.3d at 319-20, 322, especially after Siciliano's behavior negated any innocent explanation for the materials.

Of course, even though the shipments were regular and some were fairly recent, the materials could have been swiftly moved out of the apartment as they were received. But probable cause does not require certainty or even a high probability, United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999); all that was needed is "a reasonable likelihood," Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003), that some of the shipped materials, or other traces of the illegal business, might be found. Accord United States v. Sturmoski, 971 F.2d 452, 457-58 (10th Cir. 1992); United States v. Landis, 726 F.2d 540, 541-42 (9th Cir. 1984).

It might be argued in Siciliano's favor that the agents must have thought that the tip and the eBay records were not enough

for probable cause or else they would not have conducted the interview and sweep. But the agents had little to lose and a good deal to gain by conducting a consensual interview--which might either produce an innocent explanation or, more likely, reinforce probable cause by admissions or evasions and also thereby provide evidence for trial. In all events, after the interview the agents clearly had probable cause.

The other, perhaps more telling, point is that the prosecutor failed to ask the agents in the suppression hearing whether they would have sought a warrant based solely on the tip, the eBay records and the interview. Of course, the prosecutor could easily have thought this unnecessary but the failure to ask the ultimate question might allow a modest adverse inference. Still, this modest inference cannot easily overcome the ample objective reasons for the officers to seek the warrant after the interview regardless of the sweep evidence.

Murray's subjective intent inquiry calls for a counter-factual "what if" fact-finding by the district judge which is nevertheless reviewed only for "clear error," see Murray, 487 U.S. at 543-44; but whether the suppression order in this case was "clear error" or merely a close-call probable mistake protected by the standard of review, it is well for the sake of future cases to explain why the pertinent doctrine largely favors the government's position and why the outcome here is at best very doubtful.